# EXHIBIT A

1   SCOTT F. LLEWELLYN (CA SBN 34821)
    SLlewellyn@mofo.com
2   MORRISON & FOERSTER LLP
    4200 Republic Plaza
3   370 Seventeenth Street
    Denver, Colorado  80202-5638
4   Telephone: 303.592.1500
    Facsimile: 303.592.1510
5
    NATHAN B. SABRI (CA SBN 252216)
6   NSabri@mofo.com
    CAMILA A. TAPERNOUX (CA SBN 299289)
7   CTapernoux@mofo.com
    MORRISON & FOERSTER LLP
8   425 Market Street
    San Francisco, California  94105
9   Telephone: 415.268.7000
    Facsimile: 415.268.7522
10
    Attorneys for Defendant
11  APPLE INC.

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14                      SAN FRANCISCO DIVISION

15

16
    ZEROCLICK, LLC, a Texas limited liability        Case No.    3:15-cv-04417
17  company,
                                                     **APPLE INC.'S AMENDED
18                     Plaintiff,                     INVALIDITY CONTENTIONS
                                                     PURSUANT TO PATENT L.R. 3-3
19          v.                                        AND 3-4**

20  APPLE INC., a California corporation,            **JURY TRIAL DEMANDED**

21                     Defendant.

22

23

24

25

26

27

28

1   In accordance with Patent L.R. 3-3, Apple Inc. ("Apple" or "Defendant") hereby submits

2   its Amended Invalidity Contentions with respect to U.S. Patent No. 8,549,443 (the "'443 patent")

3   and U.S. Patent No. 7,818,691 (the "'691 patent") (collectively, "patents-in-suit").

4   On January 27, 2016, Plaintiff Zeroclick, LLC ("Zeroclick") served its Disclosure of

5   Asserted Claims and Infringement Contentions.  On March 14, 2016, Apple served its Invalidity

6   Contentions.

7   On June 25, 2019, the Court issued its Claim Construction Order ("Claim Construction

8   Order").  (ECF No. 77.)  The Claim Construction Order construed the terms "without requiring

9   an exertion of pressure on the screen" in the '443 patent, and "Pointer (0)" and "'click' event" in

10  the '691 patent.  The Claim Construction Order construed "Pointer (0)" as "the arrow, cursor or

11  other bitmap indicating the pointer on the computer screen representing the location of the mouse

12  position or pointer device position in relation to the computer screen." (*Id*. at 9.)  The Claim

13  Construction Order held that "Pointer (0)" must be visible, stating that, "Apple also argues

14  persuasively that dependent claim 45 is invalid for lack of written description, given that the

15  patent does not explain how an invisible pointer could 'indicate' its location 'on the screen'

16  when the pointer would not be visible to the human eye," (*id*. at 11), and "[t]he '691 patent fails

17  to meet this requirement [of 35 U.S.C. § 112] as it pertains to an 'invisible' pointer because it

18  does not explain how an invisible pointer can 'indicate' something," (*id*. at 11–12).

19  On September 3, 2019, Zeroclick served its Amended Disclosure of Asserted Claims and

20  Infringement Contentions ("Amended Infringement Contentions").  In those Amended

21  Infringement Contentions, Zeroclick asserted infringement of claims 19 and 20 of the '443 patent

22  ("Asserted Claims of the '443 patent") and claims 2-6, 12-16, 24, 26, 28-31, 35, 36, 42, 44, 45,

23  47-49, 52-56, 62-66, 74, 76, 78, 79, 81, 85, 86, 92, 94, 95, and 98-100 of the '691 patent

24  ("Asserted Claims of the '691 patent").  Zeroclick also asserted in its Amended Infringement

25  Contentions that "the 'pointer' can be a visible bitmap representing a button or slider" or a

26  "depiction of a switch," which is inconsistent with the Court's construction of "Pointer (0)," but

27  Apple nonetheless addresses in its invalidity contentions as a protective measure, reserving all

28  rights to seek relief on this issue.  Zeroclick also asserted in its Amended Infringement

1   Contentions that "the 'pointer' . . . can also be a bitmap corresponding to an area of the screen

2   that the user touches, which is invisible to the end user looking at the screen, but visible to the

3   program," which is inconsistent with the Court's construction of "Pointer (0)" and the Court's

4   holding that the '691 patent lacks a written description of an invisible pointer, but Apple

5   nonetheless addresses in its invalidity contentions as a protective measure, reserving all rights to

6   seek relief on this issue.

7          Each of the Asserted Claims is invalid because it does not claim patent-eligible subject

8   matter under 35 U.S.C. § 101, because it is anticipated and/or rendered obvious under 35 U.S.C.

9   §§ 102 and 103, because it fails to satisfy the written description and/or enablement requirements

10  under 35 U.S.C. § 112 ¶ 1, because it is indefinite under 35 U.S.C. § 112 ¶ 2, because it fails to

11  specify a further limitation of the subject matter claimed under 35 U.S.C. § 112, ¶ 4, and/or

12  because it is an insufficiently supported means-plus-function claim under 35 U.S.C. § 112 ¶ 6.[1]

13         These Amended Invalidity Contentions reflect Apple's knowledge, thinking, and

14  contentions as of the date of service.  The disclosures are based upon knowledge, information,

15  and/or belief presently available to Apple.  Discovery is ongoing.  Apple has received limited

16  documents from Zeroclick and no third-party discovery.  Expert discovery has not yet begun.

17  Apple's reliance on and/or response to Zeroclick's contentions and assertions regarding the

18  Court's Claim Construction Order does not mean that Apple in any way agrees with Zeroclick's

19  contentions or the constructions they may assert or imply.  Rather, Apple has attempted to

20  disclose the invalidating prior art and other grounds for invalidity of which it is currently aware

21  based on its understanding of the scope of Zeroclick's contentions and the Court's Claim

22  Construction Order.  Nothing herein should be presumed to represent Apple's position regarding

23  the construction of any claim terms.  Apple's positions in these invalidity contentions may be in

24  the alternative and do not constitute any concession by Apple for purposes of infringement.  *See,*

25  *e.g.*, *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000).

26

27          [1] Because the patents-in-suit were filed before March 16, 2013, the pre-America Invents

28  Act ("AIA") versions of 35 U.S.C. §§ 101, 102, 103, and 112 apply.

In addition, the identification of prior art disclosures that anticipate and/or render obvious a particular claim element in these contentions is not an admission that the claim element satisfies the requirements of 35 U.S.C. § 112. Where Apple asserts that an asserted claim is invalid under 35 U.S.C. § 112 because of a failure to particularly point out and distinctly claim the invention, failure to provide written description support in the specification, and/or failure to enable one of ordinary skill in the art to make and use the claimed invention, Apple has nonetheless provided prior art disclosures that anticipate or render obvious the Asserted Claim on the assumption that Zeroclick will contend the claim is adequately enabled, supported by an adequate written description, and definite.

Apple's Invalidity Contentions address only the specific claims asserted by Zeroclick. If Zeroclick subsequently receives permission from the Court to assert other claims, Apple reserves the right to disclose additional and/or further amended Invalidity Contentions regarding those claims.

Apple further reserves the right to modify and supplement, without prejudice, its Amended Invalidity Contentions in the event that additional prior art is identified during the course of discovery and/or in response to any findings as to the priority date(s) of the asserted claims; positions otherwise taken by Zeroclick or its expert witness(es) concerning claim construction, infringement, equivalents, and/or invalidity issues; and/or any amendment by Zeroclick of its Amended Infringement Contentions, in accordance with the Federal Rules of Civil Procedure and other applicable rules and statutes.

## I.   PRIOR ART

Subject to Apple's reservation of rights, Apple identifies each item of prior art presently known that anticipates and/or renders obvious one or more of the Asserted Claims of the patents-in-suit. The patents/applications, publications, and systems identified are also relevant for their showing of the state of the art and reasons and motivations for making improvements, additions, and combinations.

Discovery is ongoing, however, and Apple's prior art investigation and third-party discovery are therefore not yet complete. For example, Apple may issue subpoenas to third

parties believed to have knowledge, documentation, and/or corroborating evidence concerning some of the prior art listed and/or additional prior art.  These third parties include without limitation the authors, inventors, or assignees of the references listed in these disclosures.  For certain prior art public uses and/or offers for sale, Apple is investigating the identities of individuals who knew about or were involved in the making, first public use, offer for sale, and/or sale of these and certain other systems that may be invalidating prior art.  Apple is also investigating the exact date that such systems were first made, first publicly used, offered for sale, and/or sold.  Apple reserves the right to present additional items of prior art under 35 U.S.C. § 102(a), (b), (e), and/or (g), and/or § 103 located during the course of discovery or further investigation.  In addition, Apple reserves the right to assert invalidity under 35 U.S.C. § 102(c), (d), or (f) to the extent that discovery or further investigation yield information forming the bases for such invalidity.

## A.    Prior Art Patents/Publications

Apple identifies the patents or published patent applications set forth below as prior art references, each of which anticipates or renders obvious (alone or in combination with other references) one or more of the Asserted Claims of the patents-in-suit under 35 U.S.C. §§ 102(a), (b), (e), (g), and/or 103(a).  Prior art patents or patent applications included in these contentions may be related (such as a divisional, continuation, continuation-in-part, parent, or child) to earlier- or later-filed patents or publications, may have counterparts filed in other jurisdictions, or may incorporate (or be incorporated by) other patents or publications by reference.  The listed patents or patent applications are intended to be representative of those other patents or publications to the extent they exist.  Apple accordingly reserves the right to modify, amend, or supplement these contentions with those related patents or patent applications, as well as other prior art references, upon further investigation.

Table 1 – Prior Art Patents/Publications

| Number | Title | Filing date | Issue/ Publication Date |
|---|---|---|---|
| U.S. 5,283,559 ("Kalendra '559") | Automatic Calibration Of A Capacitive Touch Screen Used With A Fixed Element Flat Screen Display Panel | Sep. 21, 1992 | Feb. 1, 1994 |
| U.S. 6,160,551 ("Naughton '551") | Graphical User Interface For Displaying And Manipulating Objects | Mar. 20, 1995 | Dec. 12, 2000 |
| U.S. 5,463,725 ("Henckel '725") | Data Processing System Graphical User Interface Which Emulates Printed Material | Dec. 31, 1992 | Oct. 31, 1995 |
| U.S. 6,466,197 ("Kim '197") | Method And Apparatus For Driving Pointing Device Of Computer System | Jun. 28, 1999 | Oct. 15, 2002 |
| U.S. 5,347,295 ("Agulnick '295") | Control Of A Computer Through A Position-Sensed Stylus | Oct. 31, 1990 | Sep. 13, 1994 |
| U.S. 5,923,908 ("Schrock '908") | Camera With Touch Sensitive Control | Oct. 30, 1997 | Jul. 13, 1999 |
| U.S. 6,424,844 ("Lundqvist '844") | Portable Telephone | Nov. 18, 1999 | Jul. 23, 2002 |
| U.S. 5,488,204 ("Mead '204") | Paintbrush Stylus For Capacitive Touch Sensor Pad | Oct. 17, 1994 | Jan. 30, 1996 |
| U.S. 6,211,856 ("Choi '856") | Graphical User Interface Touch Screen With An Auto Zoom Feature | Apr. 17, 1998 | Apr. 3, 2001 |
| U.S. 6,466,203 ("Van Ee '203") | Hand-Held With Auto-Zoom For Graphical Display Of Web Page | Jul. 19, 2000 | Oct. 15, 2002 |

| Number | Title | Filing date | Issue/ Publication Date |
|---|---|---|---|
| U.S. 6,073,036 ("Heikkinen '036") | Mobile Station With Touch Input Having Automatic Symbol Magnification Function | Apr. 28, 1997 | Jun. 6, 2000 |
| U.S. 5,745,116 ("Pisutha-Arond '116") | Intuitive Gesture-Based Graphical User Interface | Sep. 9, 1996 | Apr. 28, 1998 |
| U.S. 7,197,718 ("Westerman '718") | Interactive Virtual Area Browser For Selecting And Rescaling Graphical Representations Of Displayed Data | Oct. 18, 1999 | Mar. 27, 2007 |
| U.S. 5,263,134 ("Paal '134") | Method And Apparatus For Controlling Computer Displays By Using A Two Dimensional Scroll Palette | Jul. 30, 1992 | Nov. 16, 1993 |
| U.S. 5,721,853 ("Smith '853") | Spot Graphic Display Element With Open Locking And Periodic Animation | Apr. 28, 1995 | Feb. 24, 1998 |
| U.S. 6,037,937 ("Beaton '937") | Navigation Tool For Graphical User Interface | Dec. 4, 1997 | Mar. 14, 2000 |
| U.S. 6,340,979 ("Beaton '979") | Contextual Gesture Interface | Aug. 16, 1999 | Jan. 22, 2002 |
| U.S. 6,310,610 ("Beaton '610") | Intelligent Touch Display | Dec. 4, 1997 | Oct. 30, 2001 |
| U.S. 5,986,655 ("Chiu '655") | Method And System For Indexing And Controlling The Playback Of Multimedia Documents | Oct. 28, 1997 | Nov. 16, 1999 |
| U.S. 7,030,860 ("Hsu '860") | Flexible Transparent Touch Sensing System For Electronic Devices | Oct. 8, 1999 | Apr. 18, 2006 |

| Number | Title | Filing date | Issue/ Publication Date |
|---|---|---|---|
| U.S. 5,570,113 ("Zetts '113") | Computer Based Pen System And Method For Automatically Cancelling Unwanted Gestures And Preventing Anomalous Signals As Inputs To Such System | Jun 29, 1994 | Oct. 29, 1996 |
| U.S. 5,745,719 ("Falcón '719") | Commands Functions Invoked From Movement Of A Control Input Device | Jan. 19, 1995 | Apr. 28, 1998 |
| U.S. 6,859,909 ("Lerner '909") | System And Method For Annotating Web-Based Documents | Mar. 7, 2000 | Feb. 22, 2005 |
| WO 99/01859 ("Hayhurts '859") | Mobile Telecommunication Device For Simultaneously Transmitting And Receiving Sound And Image Data | June 29, 1998 | Jan. 14, 1999 |
| EP 930770 A2 ("Aoki '770") | Portable Cellular Phone Having The Function Of A Camera | Oct. 29, 1998 | Jul. 21, 1999 |
| U.S. 5,463,696 ("Beernink") | Recognition System And Method For User Inputs To A Computer System | July 5, 1994 | Oct. 31, 1995 |
| U.S. 6,323,846 ("Westerman") | Method And Apparatus For Integrating Manual Input | Jan. 25, 1999 | Nov. 27, 2001 |
| U.S. 5,565,658 ("Gerpheid") | Capacitance-Based Proximity With Interference Rejection Apparatus And Methods | Dec. 7, 1994 | Oct. 15, 1996 |
| U.S. 5.305,017 ("Gerpheid") | Methods And Apparatus For Data Input | Jul. 13, 1992 | Apr. 19 1994 |
| U.S. 4,733,222 ("Evans '222") | Capacative-Variation-Sensitive Touch Sensing Array System | Apr. 18, 1986 | Mar. 22, 1988 |

| Number | Title | Filing date | Issue/ Publication Date |
|---|---|---|---|
| U.S. 4,878,553 ("Yamanami '553") | Position Detecting Apparatus | Sep. 14, 1987 | Nov. 7, 1989 |
| U.S. 5,321,381 ("Essig '381") | Base For An Electromechanical Functional Unit | Nov. 25, 1992 | Jun. 14, 1994 |
| U.S. 5,543,588 ("Bisset '588") | Touch Pad Driven Handheld Computing Device | Dec. 3, 1993 | Aug. 6, 1996 |
| U.S. 5,615,384 ("Allard '384") | Personal Communicator Having Improved Zoom And Pan Functions For Editing Information On Touch Sensitive Display | Aug. 29, 1995 | Mar. 25, 1997 |
| U.S. 5,856,822 ("Du '822") | Touch-Pad Digital Computer Pointing-Device | Oct. 27, 1995 | Jan. 5, 1999 |
| U.S. 6,433,801 ("Moon '801") | Method And Apparatus For Using A Touch Screen Display On A Portable Intelligent Communications Device | Sep. 26, 1997 | Aug. 13, 2002 |
| U.S. 6,580,442 ("Singh '442") | Touch-Based Information Processing Device And Method | Dec. 1, 1999 | Jun. 17, 2003 |
| U.S. 6,757,002 ("Oross '002") | Track Pad Pointing Device With Areas Of Specialized Function | Nov. 4, 1999 | Jun. 29, 2004 |
| U.S. 2001/0035854 ("Rosenberg '854") | Haptic Feedback For Touchpads And Other Touch Controls | Jan. 19, 2000 | Nov. 1, 2001 |
| U.S. 2002/0018051 ("Singh '051") | Apparatus And Method For Moving Objects On A Touchscreen Display | Sep. 15, 1998 | Feb. 14, 2002 |
| U.S. 5,600,778 ("Swanson '778") | Graphical Resource Editor For Software Customization | Sep. 8, 1995 | Feb. 4, 1997 |

| Number | Title | Filing date | Issue/ Publication Date |
|---|---|---|---|
| U.S. 5,689,667 ("Kurtenbach '667") | Methods And System Of Controlling Menus With Radial And Linear Portions | Jun. 6, 1995 | Nov. 18, 1997 |
| U.S. 5,790,115 ("Pleyer '115") | System For Character Entry On A Display Screen | Sep. 19, 1995 | Aug. 4, 1998 |
| U.S. 5,805,167 ("van Cruyningen '167") | Popup Menus With Directional Gestures | Oct. 30, 1996 | Sep. 8, 1998 |
| U.S. 6,028,271 ("Gillespie '271") | Object Position Detector With Edge Motion Feature And Gesture Recognition | Mar. 24, 1998 | Feb. 22, 2000 |
| U.S. 6,057,844 ("Strauss '844") | Drag Operation Gesture Controller | Apr. 28, 1997 | May 2, 2000 |
| U.S. 6,094,197 ("Buxton '197") | Graphical Keyboard | May 17, 1995 | Jul. 25, 2000 |
| U.S. 6,101,498 ("Scaer '498") | System For Displaying A Computer Managed Network Layout With A First Transient Display Of A User Selected Primary Attribute Of An Object And A Supplementary Transient Display Of Secondary Attributes | Nov. 17, 1997 | Aug. 8, 2000 |
| U.S. 6,104,400 ("Halachmi '400") | Large Tree Structure Visualization And Display System | Jul. 28, 1998 | Aug. 15, 2000 |
| U.S. 6,239,803 ("Driskell '803") | Method To Achieve Least Effort Selection From An Item List Of Arbitrary Length | Apr. 14, 1999 | May 29, 2001 |
| U.S. 6,337,698 ("Keely '698") | Pen-Based Interface For A Notepad Computer | Nov. 20, 1998 | Jan. 8, 2002 |

| Number | Title | Filing date | Issue/ Publication Date |
|---|---|---|---|
| U.S. 6,429,846 ("Rosenberg '846") | Haptic Feedback For Touchpads And Other Touch Controls | Jan. 19, 2000 | Aug. 6, 2002 |
| U.S. 6,445,383 ("Chambers '383") | System To Detect A Power Management System Resume Event From A Stylus And Touch Screen | Feb. 9, 1998 | Sep. 3, 2002 |
| U.S. 6,496,206 ("Mernyk '206") | Displaying Thumbnail Images Of Document Pages In An Electronic Folder | Jun. 29, 1998 | Dec. 17, 2002 |
| U.S. 6,618,063 ("Kurtenbach '063") | Method And Apparatus For Producing, Controlling And Displaying Menus | Mar. 8, 1999 | Sep. 9, 2003 |
| U.S. 6,707,443 ("Bruneau '443") | Haptic Trackball Device | Feb. 18, 2000 | Mar. 16, 2004 |
| U.S. 6,819,345 ("Jones '345") | Managing Position And Size For A Desktop Component | Feb. 17, 1998 | Nov. 16, 2004 |
| U.S. 6,915,489 ("Gargi '489") | Image Browsing Using Cursor Positioning | Mar. 28, 2001 | Jul. 5, 2005 |
| U.S. 7,003,734 ("Gardner '734") | Method And System For Creating And Displaying Images Including Pop-Up Images On A Visual Display | Nov. 28, 2000 | Feb. 21, 2006 |
| U.S. 2002/0087661 ("Matichuk '661") | One Click Web Records | Oct. 4, 2001 | Jul. 4, 2002 |
| U.S. 2003/0200505 ("Evans '505") | Method And Apparatus For Overlaying A Source Text On An Output Text | May 14, 2003 | Oct. 23, 2003 |
| EP0660218A1 ("Buxton '218") | An Improved Graphical Keyboard | Dec. 20, 1994 | Jun. 28, 1995 |

| Number | Title | Filing date | Issue/ Publication Date |
|---|---|---|---|
| U.S. 5,117,071 ("Greanias '071") | Stylus Sensing System | Oct. 31, 1990 | May 26, 1992 |
| U.S. 6,009,336 ("Harris '336") | Hand-Held Radiotelephone Having A Detachable Display | July 10, 1996 | Dec. 28, 1999 |
| EP0969641 A1 ("Romao '641") | Téléphone Mobile Avec Écran Tactile Et Clavier | May 26, 1999 | Jan. 5, 2000 |
| U.S. 5,572,005 ("Hamilton '005") | Telecommunications Booth Comprising A Telecommunications Train Having A Plurality Of Wheeled Housings | Jan. 31, 1995 | Nov. 5, 1996 |
| U.S. 5,802,467 ("Salazar '467") | Wireless And Wired Communications, Command, Control And Sensing System For Sound And/Or Data Transmission And Reception | Sep. 28, 1995 | Sep. 1, 1998 |
| PCT Application Publication No. WO 97/18547 to Ure et al. ("Ure '547") | Multi-Touch Input Device, Method And System That Minimize The Need For Memorization | Nov. 18, 1996 | May 22, 1997 |

B.    **Non-Patent Prior Art Publications**

Apple identifies the publications below as prior art references, each of which anticipates or renders obvious (alone or in combination with other references) one or more of the Asserted Claims of the patents-in-suit under 35 U.S.C. §§ 102(a), (b), (e), (g), and/or 103(a).

**Table 2 – Non-Patent Prior Art Publications**

| Title | Author | Date of Publication | Publisher |
|---|---|---|---|
| IBM Simon Users Manual | IBM | 1994 | From BellSouth, Designed by IBM |

| Title | Author | Date of Publication | Publisher |
|---|---|---|---|
| First Smartphone Turns 20: Fun Facts About Simon | Doug Aamoth | Aug. 18, 2014 | Time.com |
| Smartphone at 20: IBM Simon to iPhone 6 | Sophie Curtis | Aug. 16, 2014 | Telegraph Media Group Limited |
| The world's first smartphone, Simon, was created 15 years before the iPhone | Steven Tweedie | June 14, 2015 | Business Insider |
| A New Principle for an X-Y Touch Screen | Bent Stumpe | March 16, 1977 | CERN SPS-AOP-BS-jf, pp. i–17. CERN, Geneva (1977) |
| Touchscreen Toggle Design ("Plaisant May 1992") | Catherine Plaisant, et al. | May 3-7, 1992 | *In Proceedings of the SIGCHI Conference on Human Factors in Computing Systems (CHI '92),* Penny Bauersfeld, John Bennett, and Gene Lynch (Eds.). ACM, New York, NY, USA, pp. 667-668 |
| Newton Apple MessagePad Handbook | Apple Computer, Inc. | 1995 | Apple Computer, Inc. |
| Newton MessagePad 2000 User's Manual | Apple Computer, Inc. | 1997 | Apple Computer, Inc. |
| Investigating Touchscreen Typing: The effect of keyboard size on typing speed ("Sears Oct. 1992") | Andrew Sears, et al. | Oct. 1992 | Behaviour & Information Technology, Vol. 12, Issue 1, pp. 17-22 |
| Touchscreen Toggle Switches: Push or Slide? Design issues and usability study ("Plaisant Nov. 1990") | Catherine Plaisant and Daniel Wallace | Nov. 1990 | Human-Computer Interaction Laboratory Center for Automation Research Department of Psychology, University of Maryland |

| Title | Author | Date of Publication | Publisher |
|---|---|---|---|
| A New Era for Touchscreen Applications: High Precision, Dragging Icons, and Refined Feedback ("Plaisant June 1990") | Andrew Sears, Catherine Plaisant, Ben Shneiderman | June 1990 | Advances in Human-Computer Interaction, Vol. 3, R.Hartson, D. Hix, Ed. |
| The HP 150 Computer | Haas, Mark | November 1984 | Byte Magazine Vol. 9 No. 12. pp. 262–275 |
| Product Preview: The HP 150 | Phil Lemmons and Barbara Robertson | October 1983 | Byte Magazine Vol. 8 No. 19. pp. 36-58 |
| The Human Factors of Touch Input Devices | Alfred T. Lee | Sep. 1997 | Beta Research, Inc. |
| How CERN Broke the Software Barrier | Michael Crowley-Milling | September 29, 1977 | New Scientist Magazine Vol. 75, pp. 790-791 |
| The First Capacitive Touch Screens at CERN | Bent Stumpe and Christine Sutton | Mar 31, 2010 | CERN Courier, Vol. 50, Issue 3, p.13 |
| The 'Touch Screen' Revolution, from Physics to Daily Life: Applications in Informatics, Energy, and Environment | Bent Stumpe | Aug 27, 2014 | Wiley-Blackwell |
| Ericsson R380 User's Manual | Ericsson Mobile Communications AB | Oct. 2000 | Ericsson Mobile Communications AB |
| Ericsson R380 – The First Smartphone? | Mister Mobility | Jan. 24, 2012 | Mobilityarena.com |

| Title | Author | Date of Publication | Publisher |
|---|---|---|---|
| R380 for GSM 900/1800 Open to Communicate and Organize | Press Release | Mar. 17, 1999 | http://www.ericsson.se/ pressroom/phli_p.shtml |
| Mobile Phone R380 Design Guidelines for WAP Services | | November 1999 | Ericsson Mobile Communications AB |
| Carroll Touch Product Specification Sheet – Flat Panel Series: Infrared Flat Panel (IRFP) Touch Frames | | June 30, 1999 | Carroll Touch |
| Carroll Touch Infrared Flat Panel Touch Frames (website) | | Jan. 27, 1999 | Carroll Touch |
| A Gesture Based Text Editor, from People and Computers IV: Proceedings of the Fourth Conference of the British Computer Society. | L.K. Welbourn and R.J. Whitrow | Sep. 1988 | Cambridge University Press |
| Scheduling Home Control Devices: Design Issues and Usability Evaluation of Four Touchscreen Interfaces ("Plaisant Scheduling 1992") | Catherine Plaisant and Ben Shneiderman | 1992 | International Journal of Man-Machine Studies, Vol. 36, Issue 3, March 1992, pp. 375–393 |
| An Experiment to Study Touchscreen "Button" Design | Marcy Ann Valk | Oct. 1985 | Proceedings of the Human Factors and Ergonomics Society Annual Meeting October 1985 Vol. 29 No. 2 pp. 127-131. |

| Title | Author | Date of Publication | Publisher |
|---|---|---|---|
| Quikwriting: Continuous Stylus-based Text Entry | Ken Perlin | 1998 | In *Proceedings of the 11th annual ACM symposium on User interface software and technology* (UIST '98). ACM, New York, NY, USA, pp. 215-216. |
| The Music Notepad | Andrew Forsberg, Mark Dieterich, and Robert Zeleznik | 1998 | In *Proceedings of the 11th annual ACM symposium on User interface software and technology* (UIST '98). ACM, New York, NY, USA, pp. 203-210. |
| Some Design Refinements and Principles on the Appearance and Behavior of Marking Menus | Mark A. Tapia and Gordon Kurtenbach | Nov. 14-17, 1995 | In *Proceedings of the 8th annual ACM symposium on User interface and software technology* (UIST '95). ACM, New York, NY, USA, pp. 189-195. |
| Dasher - A Data Entry Interface Using Continuous Gestures and Language Models | David J. Ward, Alan F. Blackwell, and David J. C. MacKay | 2000 | In *Proceedings of the 13th annual ACM symposium on User interface software and technology* (UIST '00). ACM, New York, NY, USA, pp. 129-137. |
| Dasher (website) | David J. Ward | Aug. 17, 1999 | http://wol.ra.phy.cam. ac.uk/djw30/dasher |
| Touchscreen Technology Improves And Extends Its Options | Richard A. Quinnell | Nov. 9, 1995 | EDN: The DesignMagazine of the Electronics Industry |
| Dasher (animation) | David J. Ward | Aug. 17, 1999 | http://wol.ra.phy.cam. ac.uk/djw30/dasher |
| The Design and Evaluation of Marking Menus | Gordon Paul Kurtenbach | 1993 | Graduate Department of Computer Science, University of Toronto |

| Title | Author | Date of Publication | Publisher |
|---|---|---|---|
| The Amazing True Story of How the Microwave Was Invented by Accident | Matt Blitz | Feb. 23, 2016 | Popular Mechanics |
| Star7 PDA Prototype Video | James Gosling<br><br>Ed Frank | 1994 | SunMicrosystems Inc. |
| Touchscreen Toggle Design Video ("Plaisant Video") | Catherine Plaisant | Jan. 1991 | HCL Laboratory University of Maryland College Park, MD |
| Scheduling Home Control Devices Video ("Plaisant Scheduling Video") | Catherine Plaisant, Ben Shneiderman | Dec. 1989 | HCL Laboratory University of Maryland College Park, MD |
| The Power of Penpoint | Robert Carr and Dan Shafer | Feb. 1991 | Addison-Wesley Publishing Company, Inc. |
| Getting Started With Your EO Personal Communicator | Ann Cullen | 1993 | EO Publications |
| 1993 Discover Awards: Computer Hardware & Electronics: The Great Communicator | Celeste Baranski & Alain Rossmann, EO | Oct. 1, 1993 | Discover Magazine |
| FingerWorks Installation and Operation Guide for the TouchStream ST and TouchStream LP | | 2002 | FingerWorks Inc. |
| Quick Reference Guide for TouchStream ST/LP | | 1999 | FingerWorks Inc. |
| Quick Reference Guide for iGesture Products | | 1999 | FingerWorks Inc. |

| Title | Author | Date of Publication | Publisher |
|-------|--------|---------------------|-----------|
| Scheduling ON-OFF Home Control Devices: Design Issues and Usability Evaluation of Four Touchscreen Interfaces | Catherine Plaisant and Ben Shneiderman | Nov. 1989 | HCL Laboratory University of Maryland College Park, MD |
| Scheduling Home-Control Devices: A Case Study Of The Transition From The Research Project To A Product | Catherine Plaisant, et al. | June 12, 1995 | HCL Laboratory University of Maryland College Park, MD |
| Java: The Inside Story | Michael O'Connell | July 1995 | SunWorld Online |
| GO Corporation - Introducing PenPoint 1991 (video) | | 1991 | GO Corporation |
| AT&T EO Personal Communicator Owners's Video | | April 1993 | EO, Inc. |
| EO Personal Communicator Video (Computer Chronicles 1993) | | 1993 | Computer Chronicles |
| XEROX 5700 Combines Laser, Digital Technologies | Lori Valigra | Nov. 1980 | Mini-Macro Systems |
| Computer Fundamentals, from Pathology Informatics, Theory & Practice | Seung Park, et al. | 2012 | American Society for Clinical Pathology |
| The World of Messaging, An Introduction to Personal Communications | Randy Stock | 1993 | EO Publications |

| Title | Author | Date of Publication | Publisher |
|-------|--------|---------------------|-----------|
| AT&T EO Personal Communicator Third Party Product and Services Catalog | | Fall 1993 | EO, Inc. |
| AT&T EO 440 Personal Communicator | | Jan. 2014 | http://www.oldcomputers.net/eo-440.html |
| EO Personal Communicator | David Tebbutt | Feb. 1 1993 | Personal Computer World |
| EO Personal Communicator, Abstract | David Tebbutt | Feb. 1, 1993 | Personal Computer World |
| DataLink PB: The Kind of Modem Dick Tracy Would Have Loved | Stewart Alsop | June 7, 1993 | InfoWorld |
| Dissertation Proposal: The Design and Evaluation of Gestures for Pen-Based User Interfaces | A. Chris Long, Jr. | May 1997 | |
| Best of What's New Awards 1999: This Year's Greatest Achievements in Science & Technology | William G. Phillips | Dec. 1999 | Popular Science |
| User Learning and Performance with Marking Menus | Gordon Kurtenbach and William Buxton | 1994 | In *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems* (CHI '94), Beth Adelson, Susan Dumais, and Judith Olson (Eds.). ACM, New York, NY, USA, 258-264. |

| Title | Author | Date of Publication | Publisher |
|---|---|---|---|
| Hand Tracking, Finger Identification, and Chordic Manipulation on a Multi-Touch Surface | Wayne Westerman | Spring 1999 | University of Delaware |

### C.     Prior Art Offered for Sale or Publicly Used or Known

Apple identifies below products and systems (collectively "Product Prior Art") that were publicly known, in public use, offered for sale, sold, and/or invented in the U.S. (and not abandoned, suppressed, or concealed) prior to the purported effective filing date of the patents-in-suit and/or prior to the alleged invention date of the claimed inventions.  This Public Prior Art anticipates or renders obvious (alone or in combination with other references) one or more of the Asserted Claims of the patents-in-suit under 35 U.S.C. §§ 102(a), (b), (e), (g), and/or 103(a).  In addition, Apple is currently investigating the dates of conception and reduction to practice of such Public Prior Art and when such Public Prior Art was first known or used by others.  In the course of its investigation, Apple may identify additional prior art documents describing these products and systems that may also anticipate and/or render obvious the one or more Asserted Claims of the patents-in-suit as invalidating printed publications.

**Table 3 – Product Prior Art**

| Item Offered for Sale or Publicly Used or Known | Date Offered for Sale or Became Publicly Used or Known | Identity of Person Offering for Sale or Making Use or Making Known |
|---|---|---|
| Apple Newton MessagePad ("Apple Newton") | August 1993 | Apple Inc. |
| IBM Simon Personal Communicator ("IBM Simon") | August 1994 | International Business Machines Corp. |
| Ericsson R380 | December 1999 | Ericsson AB |
| HP-150 | November 1983 | Hewlett Packard |

| Item Offered for Sale or Publicly Used or Known | Date Offered for Sale or Became Publicly Used or Known | Identity of Person Offering for Sale or Making Use or Making Known |
|---|---|---|
| MicroTouch Touchscreen | 1992 | MicroTouch Systems, Inc. |
| NESELCO Capacitive Touch Screen Terminal | 1980 | NESELCO |
| Carroll Touch Infrared Flat Panel (IRFP) Touch Frames | 1996 | Elo Touch Solutions |
| Plaisant Toggle System | 1990 | Catherine Plaisant; University of Maryland |
| CERN Capacitive Touch Screen Terminal | 1980 | European Organization for Nuclear Research ("CERN") |
| Star7 System | September 1992 | Sun Microsystems; James Gosling; Ed Frank |
| Plaisant Calendar Scheduling System | 1988 | Catherine Plaisant; University of Maryland |
| EO Personal Communicator | 1993 | EO, Inc. / AT&T Corporation |
| PenPoint Operating System | 1992 | Go Corporation |
| Palm Pilot | 1996 | Palm Inc. |
| Palm OS | 1996 | Palm Inc. |
| Windows CE | 1996 | Microsoft Corporation |
| iPaq | April 2000 | Compaq |
| XEROX 5700 Laser/Digital Printing System | 1980 | Xerox Corporation |

## II. ANTICIPATION AND OBVIOUSNESS UNDER 35 U.S.C. §§ 102 AND 103

In accordance with Patent Local Rule 3-3(b), Apple hereby identifies whether each item of prior art anticipates and/or renders obvious the Asserted Claims of the patents-in-suit.  Apple

reserves the right to amend or otherwise modify this disclosure if and when further relevant information is provided by Zeroclick or other circumstances change.

**A.     Invalidity Claim Charts**

Claim charts for the Asserted Claims of the '443 patent are attached as Exhibits A-1 through A-18, and claim charts for the Asserted Claims of the '691 patent are attached as Exhibits B-1 through B-18, (collectively, "Invalidity Charts").  The Invalidity Charts identify where specifically in each item of prior art each element of each Asserted Claim is found.  Each Invalidity Chart identifies by citation the disclosures within the prior art reference(s) that teach the relevant claim elements, limitations, and/or rationale supporting the combination(s).  Any physical embodiments of the references described in the Invalidity Charts that were publicly available during the relevant time period also constitute prior art.

While Apple has identified citations in the references for the claim limitations, each and every disclosure of the same limitation in the same reference is not necessarily identified.  In an effort to focus the issues, Apple cites only portions of the references, even when a reference may contain additional support for or disclosure of a particular claim element.  Where Apple cites a particular figure, table, or video in or relating to a prior art reference, the citation should be understood to encompass any text referring or relating to the directly cited material, in addition to the directly cited material itself.  Similarly, where a cited portion of text refers to a figure, table, and/or video, the citation should be understood to include the figure as well.  For dependent claims, Apple's contentions and Invalidity Charts should be understood to incorporate by reference the prior art disclosures and teachings cited for the claim(s) from which the dependent claims depend.

Apple's reference to a prior art particular computer, software program, device, or product in these contentions should be interpreted as a reference to the product itself and any corresponding patents, publications, or product literature cited in these contentions that relates to the cited computer software program, device, or product.  In addition, Apple may rely on other documents or things that have not yet been located to support its contentions regarding such prior

art computer(s), software program(s), device(s), or product(s) that are referenced in these contentions.

For any claim limitation that Zeroclick alleges is not disclosed in a particular prior art reference, Apple reserves the right to assert that such limitation is inherent, that the limitation would have been obvious to one of ordinary skill in the art at the relevant time, and/or that the limitation is disclosed in one or more prior art references that individually or in combination would have rendered the asserted claim obvious.

Apple further reserves the right to identify and rely on additional art or teachings within the cited art. Unless otherwise stated, it should be presumed that Apple intends to rely upon each reference in its entirety to the extent relevant and/or appropriate, including references cited in and/or referenced within the prior art identified below.

The prior art references produced by Apple reflect the "state of the art" as of the purported effective filing date of the patents-in-suit and/or the alleged invention date of the Asserted Claims of the patents-in-suit. These references illustrate the scope and content of the prior art, the knowledge of those skilled in the relevant field, as well as the motivations of skilled persons to modify and combine known systems and components during the relevant time period. Persons of ordinary skill in the art read a prior art reference as a whole, and in the context of other publications and literature. Accordingly, Apple may rely on uncited portions of the prior art references and on other publications and expert testimony to provide context, and as aids to understanding and interpreting the portions of references that are cited. Apple may also rely on uncited portions of the prior art references, other publications, and the testimony of experts to establish that a person of ordinary skill in the art would have been motivated to modify or combine certain of the cited references so as to render the claims obvious.

**B.     Invalidity of the '443 Patent Based on 35 U.S.C. §§ 102 and 103**

The Asserted Claims of the '443 patent are invalid as anticipated under 35 U.S.C. § 102(a), (b), (e), and/or (g), and/or rendered obvious under 35 U.S.C. § 103 by the following prior

art references as set forth below.  The combinations that render each claim obvious are identified in the individual charts.

| Chart No. | Primary Reference | Claims Anticipated | Claims Rendered Obvious |
|---|---|---|---|
| A-1 | U.S. Patent No. 5,745,719 ("Falcon '719") | - | 19-20 |
| A-2 | U.S. Patent No. 6,859,909 ("Lerner '909") | 19 | 19-20 |
| A-3 | The Design and Evaluation of Marking Menus ("Kurtenbach") | 19 | 19-20 |
| A-4 | U.S. Patent No. 6,073,036 ("Heikkinen '036") | 19, 20 | 19-20 |
| A-5 | U.S. Patent 6,211,856 ("Choi '856") | 19 | 19-20 |
| A-6 | IBM Simon | 19-20 | 19-20 |
| A-7 | Ericsson R380 | 19, 20 | 19-20 |
| A-8 | U.S. Patent No. 5,721,853 ("Smith '853") | - | 19-20 |
| A-9 | U.S. Patent No. 5,463,725 ("Henckel '725") | 19 | 19-20 |
| A-10 | U.S. Patent No. 6,466,197 ("Kim '197") | - | 19-20 |
| A-11 | Star7 Prototype Touch Screen System ("the Star7 System") | 19 | 19-20 |
| A-12 | U.S. Patent No. 5,347,295 ("Agulnick '295") | 19 | 19-20 |
| A-13 | Apple Newton MessagePad ("Apple Newton") | 19 | 19-20 |
| A-14 | U.S. Patent No. 5,745,116 ("Pisutha-Arnond '116") | 19, 20 | 19-20 |
| A-15 | Plaisant Touch Screen System ("the Plaisant System") | 19 | 19-20 |

| Chart No. | Primary Reference | Claims Anticipated | Claims Rendered Obvious |
|-----------|-------------------|--------------------|-------------------------|
| A-16 | U.S. Patent No. 5,923,908 ("Schrock '908") | 19 | 19-20 |
| A-17 | U.S. Patent No. 5,570,113 ("Zetts '113") | 19 | 19-20 |
| A-18 | EO Personal Communicator with PenPoint OS | 19, 20 | 19-20 |

### 1.      Anticipation

Claim 19 recites:

> A device capable of executing software comprising:
>> a touch-sensitive screen configured to detect being touched by a user's finger without requiring an exertion of pressure on the screen;
>> a processor connected to the touch-sensitive screen and configured to receive from the screen information regarding locations touched by the user's finger;
>> executable user interface code stored in a memory connected to the processor; the user interface code executable by the processor;
>> the user interface code being configured to detect one or more locations touched by a movement of the user's finger on the screen without requiring the exertion of pressure and determine therefrom a selected operation; and
>> the user interface code is further configured to cause one or more selected operations, which includes one or more functions available to the user interface code of the device, to deactivate while the user's finger is touching one or more locations on the screen.

Claim 19 is anticipated at least by the following prior art references: the Plaisant System and Schrock '908. A more detailed disclosure of how these prior art references anticipate claim 19 of the '443 patent is provided in Exhibits A-15 and A-16. These are merely exemplary anticipatory references. The complete set of references that anticipate claims 19 and 20 is identified in the table above.

**Plaisant System** anticipates claim 19.  The Plaisant System was not disclosed to, or considered by, the USPTO during the prosecution of the '443 patent.  It was developed in 1990-1992 by researchers at the University of Maryland to conduct one or more usability studies of six different touchscreen toggle designs around 1990-92, and thus qualifies as prior art against the Asserted Claims of the '443 patent at least under pre-AIA §§ 102(a) and (b).  The Plaisant System and studies are described in various publications, including articles from June 1990,[2] November 1990,[3] and May 1992,[4] and a video[5] from 1991 narrated by Catherine Plaisant.

The Plaisant System allowed a user to select an operation, such as turning off a device, by moving the slider toggle with his or her finger from the ON position to the OFF position on the user interface, as shown in Figure 2 below.  (*See, e.g.*, Plaisant Nov. 1990 at 5-6 ("If the device is ON the pointer is on the ON side.  Users can then grab the pointer and slide it to the other side. . . .  A click is heard when the state changes (high pitch for ON, low pitch for OFF)."); Plaisant May 1992 at 667-68 (same), Figure 2.)

---

[2] A new era for touchscreen applications: High precision, dragging icons, and refined feedback, Andrew Sears, et al., June 1990 ("Plaisant June 1990").
[3] Touchscreen Toggle Switches: Push or Slide? Design issues and usability study, Catherine Plaisant, et al., Nov. 1990 ("Plaisant Nov. 1990").
[4] Touchscreen Toggle Design, Catherine Plaisant, et al., May 3-7, 1992 ("Plaisant May 1992").
[5] TouchscreenToggle DesignVideo, Catherine Plaisant (1991), https://www.youtube.com/watch?v=wFWbdxicvK0.

1

2

3

4

5

6

7

8

9



Figure 2: The six toggles: one-button, "words", two-button, rocker, slider and lever. In the tested application users did see several lines of devices names with the corresponding toggles on the side (only one type of toggle is used at a time).

10   Moreover, the Plaisant System was configured to deactivate a selected operation while

11 the user's finger is touching one or more locations on the screen.  For example, if the user moved

12 her finger off of the pointer before the pointer reached the OFF position, the pointer would

13 spring back to the ON position.   (*See, e.g.*, Plaisant Nov. 1990 at 5-6 ("If the device is ON the

14 pointer is on the ON side.  Users can then grab the pointer and slide it to the other side.  If the

15 finger is released before reaching the other side the pointer springs back to its previous

16 position."); Plaisant May 1992 at 667-68 (same), Figure 2.)  The user could also deactivate a

17 selected operation by not completing the movement from ON to OFF and, instead, returning the

18 pointer to the original position.  (*Id.*)

19   The Plaisant System was equipped with a MicroTouch capacitive touch-sensitive screen,

20 which is configured to detect being touched by a user's finger without requiring an exertion of

21 pressure on the screen.  (*See, e.g.*, Plaisant Nov. 1990 at 4 (Plaisant System was equipped with a

22 MicroTouch touchscreen that "returns a continuous flow of coordinates with a 1024x1024

23 resolution"); Sears Oct. 1992 at 3 ("The MicroTouch touchscreen is a capacitive touchscreen that

24 provides continuous information about the location of a touch on a 1024x1024 grid.").)  Thus, to

25 the extent the various Plaisant publications and Plaisant video that describe the Plaisant System

26 do not expressly disclose detecting finger movement on the touch-sensitive screen "without

27

28

requiring an exertion of pressure on the screen," the limitation is inherently disclosed by the use of the capacitive MicroTouch touchscreen.

Exhibit A15 further identifies how specifically the Plaisant System teaches each element of each asserted claim.

**Schrock '908** also anticipates claim 19.  Schrock '908 was not disclosed to, or considered by, the United States Patent Office (USPTO) during the prosecution of the '443 patent.  Schrock '908 issued on July 13, 1999, and thus qualifies as prior art against the Asserted Claims of the '443 patent at least under pre-AIA §§ 102(a), (b), and (e).

Schrock '908 teaches a camera having a touch-sensitive screen and a user interface configured to detect movement of a user's finger and thereby selecting an operation within the camera, such as activating the shutter or regulating the zoom operation of the camera.  (*See, e.g.*, Schrock '908 at Abstract, 4:33-40.)  For example, to activate the shutter, the user touches the shutter icon 28 with his or her finger and moves the icon from 28a to 28b by sliding the finger on the touch-sensitive screen, as indicated by Figure 2 below.  (*See, e.g.*, Schrock '908 at 4:26-40, Fig. 2.)



*Fig. 2*

Schrock '908 further teaches that, if the user's finger does not follow the path from A to B but is moved in a different direction on the touch-sensitive screen, the shutter operation is deactivated. (*See, e.g.*, Schrock '908 at 4:49-63, Fig. 4.)  During deactivation, the camera clears

any parameters calculated for performing the shutter operation.  (*See, e.g.*, Schrock '908 at 4:49-63, Fig. 4.)

Schrock '908 further teaches that the touch-sensitive screen may be a capacitive touch-sensitive screen, which is configured to detect being touched by a user's finger without requiring an exertion of pressure on the screen.  (*See, e.g.*, Schrock '908 at 3:14-23, 3:46-49.)

Exhibit A16 further identifies where specifically in Schrock '908 each element of claim 19 is found.

## 2.    Obviousness

As set forth below and in the Invalidity Charts attached as Exhibits A-1 to A-18, to the extent the foregoing references are found not to anticipate the Asserted Claims of the '443 patent, the foregoing references render the asserted claims obvious under 35 U.S.C. § 103 either alone or in combination with each other or one or more of the other references identified above.  The inclusion of certain exemplary combinations in these Invalidity Charts does not exclude other combinations.  The combinations are not meant to be exhaustive.  Apple contends that it would have been obvious to a person of ordinary skill in the art to combine any of the various references cited herein so as to practice the Asserted Claims of the '443 patent.  Apple reserves its rights to identify additional specific combinations as well as to detail and explain such combinations.

The Asserted Claims of the '443 patent, under Zeroclick's apparent read in its Infringement Contentions, as best understood by Apple, disclose in essence the following features:  a processor, software, memory, a touch sensitive screen that does not require pressure, and determining or deactivating operations through a user interface on the touch-sensitive screen.  Claim 20 further recites a mobile phone.  Zeroclick did not "invent" any of these features.  Rather, as discussed below and more fully in the attached Exhibits A-1 to A-18, each element of the Asserted Claims of the '443 patent is fully disclosed in the prior art.

At the time of the purported effective filing and/or alleged invention dates of the '443 patent, processors, software, and memory were conventional computer components.

1    Furthermore, capacitive touch-sensitive screens, which detect a finger touching the screen

2    without require the exertion of pressure, were developed in the 1970s, long before the purported

3    effective filing date of the '443 patent.  (*See, e.g.*, A New Principle for an X-Y Touch Screen

4    (describing a new capacitive touch-sensitive screen).)  Computer terminals with capacitive

5    touch-sensitive screens were commercially available as early as the 1970s and 80s.  (*See, e.g.*,

6    How CERN broke the software barrier at 791 (capacitive touch-sensitive screens developed by

7    CERN commercially available in 1977); The first Capacitative Touch Screens at CERN at 4-5

8    (first capacitive touch-sensitive screen was commercialized in 1980 by NESELCO).))  Zeroclick

9    therefore did not invent a touch-sensitive screen configured to "detect being touched by a user's

10   finger without requiring an exertion of pressure on the screen" or "detect one or more locations

11   touched by a movement of the user's finger on the screen without requiring the exertion of

12   pressure" as recited in claim 19.

13   Furthermore, the concept of determining or deactivating operations through a user

14   interface on a touch-sensitive screen was common practice.  (*See, e.g.*, Schrock '908 at 4:49-63,

15   Fig. 4; Henckel '725 at 1:51-57, 3:3-26, 4:25-52, Figs. 2 and 4; Plaisant Nov. 1990 at 5-6 ("If the

16   device is ON the pointer is on the ON side.  Users can then grab the pointer and slide it to the

17   other side.  If the finger is released before reaching the other side the pointer springs back to its

18   previous position."); Plaisant May 1992 at 667-68 (same).)  In many ways, this is the very

19   purpose for employing touch-sensitive screens in electronic devices.  By the time of filing,

20   portable digital devices had already been using finger-operated, touch-sensitive screens to select

21   or deactivate operations for several years.  (*See, e.g.*, Apple Newton, IBM Simon, Ericsson

22   R380, Star7 System, and EO Personal Communicator.)

23   Finally, mobile phones with touch-sensitive screens were known many years before the

24   purported effective filing date of the '443 patent.  (*See, e.g.*, Examiner's Official Notice, Final

25   Rejection dated March 11, 2013 at 16 ("[B]oth the concept and the advantages of using a mobile

26   phone or specially utilizing a touch sensitive screen mobile phone is notoriously well known and

27   expected in the art."); *see also* Pisutha-Arnond '116 at 2:51-67, Figs. 1, 3, 5-8; Hsu '860 at 2:57-

28

60; IBM Simon User Manual at 9-11, 45-47; Ericsson R380 User's Manual at 23-26, 68-73, 94-103.)

As explained herein and/or in the accompanying Invalidity Charts, in the event that any of the Asserted Claims of the '443 patent is not found anticipated based on a determination that some feature of the claim is not in an item of prior art, it would have been obvious to a person of ordinary skill in the art as of the purported effective filing date of the '443 patent and/or the alleged invention date of the Asserted Claims of the '443 patent to combine the various references cited herein so as to practice the Asserted Claims of the '443 patent.  The prior-art item renders the claim obvious because, as discussed above, the missing feature was known to persons skilled in the art in the field at the time, could have been added by those persons to the device or method disclosed by the prior art, and adding that known feature would yield predictable results, so that the subject matter of the claim as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art.  *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007).

The motivation to combine comes from many sources, including the prior art (specific and as a whole), common knowledge, common sense, predictability, expectations, industry trends, design incentives or need, market demand or pressure, market forces, obviousness to try, the nature of the problem faced, and/or knowledge possessed by a person of ordinary skill.  Apple reserves the right to rely on the knowledge of those skilled in the art, the testimony of expert witnesses, and/or other prior art, to show that it would have been obvious to include the allegedly missing limitation and to explain the motivation to combine the prior art elements.

For example, to the extent that any reference identified above does not disclose the use of a touch-sensitive screen that does not require pressure (i.e. a capacitive touchscreen), it would have been obvious to a person of ordinary skill in the art at the time of the invention of the '443 patent to implement the graphical user interface ("GUI") disclosed in that reference on a capacitive touchscreen.  The motivation to do so is particularly strong because capacitive touchscreens sought to solve the same problem and come from the same field as non-capacitive touchscreens:  both are human interfaces that respond to touch.  It would have been obvious to

try the combination or modification in light of design incentives to: eliminate the need for a stylus to provide input, frontal shielding, and a uniformly conductive surface (*see, e.g.*, Hsu '860 at 2:7-21); improve device durability (*id.* at 3:1-5, FIG. 1); improve positioning accuracy and weather resistance without calibration (*id.* at 3:9-16); allow greater transparency in the screen (id. at 3:16-18); and eliminate shape constraints imposed by the requirement of a flexible substrate (*id.* at 3:19-25). Moreover, the prior art teaches or suggests making the combination or modification claimed in the patent. In fact, the Examiner in the prosecution of the '443 patent took Official Notice that "it would have been obvious to incorporate a user's finger operating on touch sensitive screen." (Examiner's Official Notice, Non-Final Rejection dated December 4, 2012 at 7, emphasis added.) Therefore, a person of ordinary skill in the art would have been motivated to modify screens on electronic devices to respond to a user's touch without requiring pressure.

As another example, to the extent that any reference identified above does not disclose deactivation of an operation while the user's finger is touching the screen, it would have been obvious to a person of skill in the art as of the purported effective filing date of the '443 patent to add this feature to the user interfaces taught by the prior art references cited herein. One of ordinary skill in the art would have been motivated to modify these interfaces so that the user interface code is further configured to cause one or more selected operations to deactivate while the user's finger is touching one or more locations on the screen, at least, because it would allow the user more and faster control over the gesture based command. Modifying user interfaces to cause one or more selected operations to deactivate while the user's finger is touching one or more locations on the screen would have been straightforward and predictable.

Finally, to the extent that any reference identified above does not disclose the use of a mobile phone, it would have been obvious to a person of skill in the art as of the purported effective filing date of the '443 patent and/or the alleged invention date of claim 20 of the '443 patent to combine the user interfaces taught by Schrock '908, the Plaisant System, Henckel '725, the Star7 System, and other prior art references cited herein, with references disclosing mobile phones, such as IBM Simon, Ericsson R380, Pisutha-Arnond '116, and Hsu '860. The

motivation to do so is particularly strong because mobile phones and touchscreen interfaces relate to the same field of endeavor: the field of human-interface design. The idea of incorporating capacitive touch screens into digital handheld devices (*e.g.*, mobile phones) preceded the purported effective filing date of the '443 patent by years. (*See, e.g.*, Hsu '860 at 2:57-60, 2:66-3:25, 4:4-23, Fig. 1; Schrock '908 at 3:14-23, 3:46-49.) In fact, the Examiner in the prosecution of the '443 patent took "Official Notice . . . that both the concept and the advantages of using a mobile phone or specially utilizing a touch sensitive screen mobile phone is notoriously well known and expected in the art." (Examiner's Official Notice, Final Rejection dated March 11, 2013 at 16.) Therefore, a person of ordinary skill in the art would have been motivated to combine the references disclosed above with a mobile phone.

The following discussion of IBM Simon, Ericsson R380, Henckel '725, Star7 System, Apple Newton, and Pisutha-Arnond '116, which render claim 19 obvious, illustrate the motivation to combine with any one of multiple prior art references cited herein that disclose capacitive touch-sensitive screen sensing. A more detailed disclosure of how these prior art references render obvious claims 19 of the '443 patent is provided in Exhibits A-6, A-7, A9, A-11, A-13, and A-14. These are merely exemplary references that render claim 19 obvious. The complete set of references that render claims 19 and 20 obvious is identified in the table in Section II.B above. A detailed disclosure of how these prior art references render obvious claims 19 and 20 of the '443 patent is provided in Exhibits A-1 to A-18.

**IBM Simon** anticipates and/or renders obvious claim 19. IBM Simon was not disclosed to, or considered by, the USPTO during the prosecution of the '443 patent. IBM Simon was in public use or on sale in August 1994, and thus qualifies as prior art against the Asserted Claims of the '443 patent at least under pre-AIA §§ 102(a) and (b). IBM Simon discloses a gesture based user interface for interacting with a touch screen of a phone using a human finger. (*See, e.g.*, IBM Simon User Manual at 9-11.) IBM Simon teaches a user interface capable of detecting movement of a pointer device to select an operation, *e.g.,* handwriting, manipulating a fax, and deletion of text. (*Id*. at 45-47.) IBM Simon also discloses using slider buttons (*id*., at 23 and 63)

or checkbox features (*id*. at 10) to deactivate various features while the user's finger is touching the screen.

To the extent IBM Simon does not expressly disclose the use of a touch-sensitive screen that is capable of detecting movement of a finger without requiring exertion of pressure, such screens, *e.g.*, capacitive touch-sensitive screens, were known in the art long before the purported effective filing date of the '443 patent.  For example, numerous references cited herein disclose either expressly or inherently the use and benefits of capacitive touch-sensitive screens.  (*See, e.g.*, Plaisant System (included a MicroTouch touchscreen, a capacitive touch-sensitive screen); Hsu '860 at 2:66-3:25 (describing the benefits of capacitive touch-sensitive screens over, *e.g.*, resistive touch-sensitive screens); Plaisant June 1990 at 19 (noting that capacitive touch-sensitive screens are "better for tasks that involve dragging objects on the screen").)  A person of ordinary skill in the art would have understood that the benefits of capacitive touch-sensitive screens would have improved on the user interface taught by IBM Simon.  For example, a person of ordinary skill in the art would have appreciated that the touchscreen interface disclosed in IBM Simon would have been improved if the user could interact with the mobile phone screen by sliding his finger without having to exert pressure on the screen.  A person of skill in the art would have understood that such combination would improve the usability of the invention taught by IBM Simon because it would allow the user to more easily perform the user interface operations taught by IBM Simon.

A person of ordinary skill in the art would further have understood that implementing the touch screen user interface taught by IBM Simon using the capacitive proximity sensing system and touch screen taught by Hsu '860, the capacitive touch-sensitive screen taught by Schrock '908, or the capacitive touch-sensitive screen used in the Plaisant System would have been straightforward and predictable.  Hsu '860, Schrock '908, the Plaisant System, and IBM Simon all disclose user interfaces implemented on a touch-sensitive screens that respond to finger movement. (*See, e.g.*, Hsu '860 at 2:57-60, 4:4-23, 5:22-53, 6:14-37, Figs.1-4; Schrock '908 at 3:14-23, 3:46-49; Plaisant System; IBM Simon User Manual at 9-11, 23, 45-47, and 63.)  In addition, Hsu '860 specifically teaches applying a capacitive touch-sensitive screen to a cell

1   phone like the IBM Simon.  (Hsu '860 at 2:57-60.)  Therefore, a person of ordinary skill would

2   be able to implement the user interface of IBM Simon on the capacitive touch-sensitive screens,

3   which detect being touched by a user's finger without requiring an exertion of pressure on the

4   screen,  taught or used by these other prior art references.

5        Exhibit A-6 further identifies how IBM Simon, alone or in combination with other

6   references, renders obvious claim 19.

7        **Ericsson R380** also anticipates and/or renders obvious claim 19.  Ericsson R380 was not

8   disclosed to, or considered by, the USPTO during the prosecution of the '443 patent.  Ericsson

9   R380 was in public use or on sale in 2000, and thus qualifies as prior art against the Asserted

10  Claims of the '443 patent at least under pre-AIA §§ 102(a) and (b).  Ericsson R380 discloses a

11  gesture based user interface for interacting with a touch screen of a phone.  (*See, e.g.*, Ericsson

12  R380 User's Manual at 23-26 and 68-73.)  Ericsson R380 teaches a user interface capable of

13  detecting movement of a pointer device to select an operation, *e.g.*, handwriting and/or deletion

14  of text. (*Id.* at 23-26, 68-73, and 94-103.)  Ericsson R380 also discloses deactivating a selected

15  operation (*e.g.*, entering and leaving "extended mode") while the stylus is touching the screen.

16  (*See, e.g.*, *id.*)

17       To the extent Ericsson R380 does not expressly disclose the use of a touch-sensitive

18  screen that is capable of detecting movement of a finger without requiring exertion of pressure,

19  such screens, *e.g.*, capacitive touch-sensitive screens, were, as discussed above, known in the art

20  long before the purported effective filing date of the '443 patent.  A person of ordinary skill in

21  the art would have understood that the benefits of capacitive touch-sensitive screens would have

22  improved on the user interface taught by Ericsson R380.  For example, a person of ordinary skill

23  in the art would have appreciated that the touchscreen interface disclosed in Ericsson R380

24  would have been improved if the user could interact with the mobile phone screen by sliding his

25  finger without having to exert pressure on the screen.  A person of skill in the art would have

26  understood that such combination would improve the usability of the invention taught by

27  Ericsson R380 because it would allow the user to more easily perform the user interface

28  operations taught by Ericsson R380.

1    A person of ordinary skill in the art would further have understood that implementing the

2    touch screen user interface taught by Ericsson R380 using the capacitive proximity sensing

3    system and touch screen taught by Hsu '860, the capacitive touch-sensitive screen taught by

4    Schrock '908, or the capacitive touch-sensitive screen used in the Plaisant System would have

5    been straightforward and predictable.  Hsu '860, Schrock '908, the Plaisant System, and Ericsson

6    R380 all disclose user interfaces implemented on a touch-sensitive screen that respond to finger

7    movement. (*See, e.g.*, Hsu '860 at 2:57-60, 4:4-23, 5:22-53, 6:14-37, Figs.1-4; Schrock '908 at

8    3:14-23, 3:46-49; Plaisant System; Ericsson R380 User's Manual at 23-26, 68-73, 94-103.)  In

9    addition, Hsu '860 specifically teaches applying a capacitive touch-sensitive screen to a cell

10   phone. (Hsu '860 at 2:57-60.)  Therefore, a person of ordinary skill would be able to modify the

11   user interface of Ericsson R380 such that it implemented the capacitive touch-sensitive screens,

12   which detect being touched by a user's finger without requiring an exertion of pressure on the

13   screen, taught or used by these other prior art references.

14   Exhibit A-7 further identifies how Ericsson R380, alone or in combination with other

15   references, renders obvious claim 19.

16   **Henckel '725** also anticipates and/or renders obvious claim 19.  Henckel '725 was not

17   disclosed to, or considered by, the USPTO during the prosecution of the '443 patent.  Henckel

18   '725 issued on October 31, 1995, and thus qualifies as prior art against the Asserted Claims of

19   the '443 patent at least under pre-AIA §§ 102(a), (b), and (e).  Henckel '725 discloses a user

20   interface for interacting with an electronic version of a book or magazine on a touch-sensitive

21   screen.  Henckel '725 teaches that the user interface is capable of detecting movement of the

22   user's finger to select an operation, such as turning a single page or activating a page flipping

23   operation.  (*See, e.g.*, Henckel '725 at 1:51-57, 4:25-52, Figs. 2 and 4.)  Henckel '725 also

24   discloses deactivating a selected operation while the user's finger is touching the screen, *e.g.*

25   canceling the turning of a page or deactivating the page flipping function.  (*See, e.g.*, Henckel

26   '725 at 3:3-26, '725 at 4:44-52 ("The user may also, if desired, slide his or her finger completely

27   off the book into the background area 14, which also causes the page flipping function to

28   cease."), Figs. 2 and 4.)

To the extent Henckel '725 does not expressly disclose the use of a touch-sensitive screen that is capable of detecting movement of a finger without requiring exertion of pressure, such screens, *e.g.*, capacitive touch-sensitive screens, were, as discussed above, known in the art long before the purported effective filing date of the '443 patent.  A person of ordinary skill in the art would have understood that the benefits of capacitive touch-sensitive screens would have improved on the user interface taught by Henckel '725.  For example, a person of ordinary skill in the art would have appreciated that the touchscreen interface disclosed in Henckel '725 would have been improved if the user could interact with the electronic book or magazine by sliding his finger without having to exert pressure on the screen.  A person of skill in the art would have understood that such combination would improve the usability of the invention taught by Henckel '725 because it would allow the user to more easily turn the pages of the electronic book or magazine disclosed in Henckel '725.

A person of ordinary skill in the art would further have understood that implementing the touch screen user interface taught by Henckel '725 using the capacitive proximity sensing system and touch screen taught by Hsu '860, the capacitive touch-sensitive screen taught by Schrock '908, or the capacitive touch-sensitive screen used in the Plaisant System would have been straightforward and predictable.  Hsu '860, Schrock '908, the Plaisant System, and Henckel '725 all disclose user interfaces implemented on a touch-sensitive screen that respond to finger movement.  (*See, e.g.*, Hsu '860 at 2:57-60, 4:4-23, 5:22-53, 6:14-37, Figs.1-4; Schrock '908 at 3:14-23, 3:46-49; Plaisant System; Henckel '725 at 1:51-57, 3:3-26, 4:25-52, Figs. 2 and 4.)  Therefore, a person of ordinary skill would be able to modify the user interface of Henckel '725 such that it implemented the capacitive touch-sensitive screens, which detect being touched by a user's finger without requiring an exertion of pressure on the screen, taught or used by these other prior art references.

Exhibit A9 further identifies how Henckel '725, alone or in combination with other references, renders obvious claim 19.

**Star7 System** also anticipates and/or renders obvious claim 19.  The Star7 System's features and functionality are disclosed, in part, in the Star7 Video and in U.S. Patent No.

6,160,551 ("Naughton '551"), included in these contentions.  Neither the Star7 System, Star7 Video, nor Naughton '551 was disclosed to, or considered by, the USPTO during the prosecution of the '443 patent.  The Star7 System was developed by Sun Microsystems, Inc. in 1991-92, and thus qualifies as prior art against the Asserted Claims of the '443 patent at least under pre-AIA §§ 102(a) and (b).  The Star7 System was a hand-held, portable computer with a user interface on a touch-sensitive screen and wireless/radio capabilities.  (Star7 Video at 0:05-19.)  It allowed users to navigate and move virtual objects displayed on the touch-sensitive screen.  (*Id.*)

The Star7 System includes a user interface capable of detecting movement of a user's finger on the screen and determining therefrom a selected operation, *e.g.*, moving a virtual object from one area to another.  (*See, e.g.*, Star7 Video at 7:41-7:53.)  The video shows how this interface meets the claimed "deactivat[ion of a function] while the user's finger is touching one or more locations on the screen."  For example, the video shows a sequence in which a virtual television icon becomes activated, as indicated by a green aura around the icon, when a user drags a virtual object over the icon.  (*See* still images of Star7 Video at 7:49 and 7:50 below.)  The icon deactivates, as indicated by the loss of its green aura, when the user drags the virtual object with his finger off of the TV icon. (*See* still image of Star7 Video at 7:51 below.)  The images and video show that this deactivation takes place while the user's finger is still touching the screen. (*Id*.)



(Star7 Video at 7:49 (annotated), television icon deactivated (no green aura.))



(Star7 Video at 7:50 (annotated), television icon activates
because virtual object brought over icon (note green aura.))

1
2
3
4
5
6
7
8
9
10
11



12    (Star7 Video at 7:51 (annotated), the icon loses its green aura and "deactivate[s] while the

13    user's finger is touching one or more locations on the screen.")

14    To the extent Star7 System does not expressly disclose the use of a touch-sensitive screen

15    that is capable of detecting movement of a finger without requiring exertion of pressure, such

16    screens, *e.g.*, capacitive touch-sensitive screens, were known in the art long before the purported

17    effective filing date of the '443 patent.  For example, numerous references cited herein disclose

18    either expressly or inherently the use and benefits of capacitive touch-sensitive screens.  A

19    person of ordinary skill in the art would have understood that the benefits of capacitive touch-

20    sensitive screens would improve on the Star7 System.  For example, Plaisant June 1990 teaches

21    that capacitive touch-sensitive screens are "better for tasks that involve dragging objects on the

22    screen."  (Plaisant June 1990 at 19.)  A person of skill in the art would, therefore, have been

23    motivated to combine the touchscreen interface used in the Star7 System with one or more of the

24    prior art references disclosing a capacitive touch-sensitive screen.  The motivation to combine

25    comes from the known benefits of capacitive touch-sensitive screens over other types of touch

26    screen that require an exertion of pressure, especially as it relates to moving the user's finger on

27    the touch screen.  In particular, a person of ordinary skill in the art would have appreciated that

28

1    the touchscreen interface used in Star7 System would have been improved if the user could

2    perform the disclosed operations by sliding his finger without having to exert pressure on the

3    screen.  A person of ordinary skill in the art would have understood that such combination would

4    improve the usability of the invention taught by Star7 System because it would allow the user to

5    more easily perform the available touch screen operations.

6         Exhibit A-11 further identifies how Star7 System, alone or in combination with other

7    references, renders obvious claim 19.

8         **Apple Newton** also anticipates and/or renders obvious claim 19.  The Apple Newton was

9    not disclosed to, or considered by, the USPTO during the prosecution of the '443 patent.  The

10   Apple Newton was in public use or on sale in August 1993, and thus qualifies as prior art against

11   the Asserted Claims of the '443 patent at least under pre-AIA §§ 102(a) and (b).  The Apple

12   Newton discloses a gesture based user interface for interacting with a hand-held message pad.

13   (*See, e.g.*, Newton MessagePad Handbook at 13-19, 57-69.)  Apple Newton teaches a user

14   interface capable of detecting movement of a pointer device to select an operation, *e.g.,*

15   handwriting. (*Id*. at 44-45.)  Apple Newton also discloses deactivating a selected operation (*e.g.,*

16   deactivating a selection of text, removing a portion text, or removing a portion of a drawing)

17   while the stylus is touching the screen.  (*See, e.g.*, Newton MessagePad Handbook at 58-62.)

18        To the extent Apple Newton does not expressly disclose the use of a touch-sensitive

19   screen that is capable of detecting movement of a finger without requiring exertion of pressure,

20   such screens, *e.g.*, capacitive touch-sensitive screens, were known in the art long before the

21   purported effective filing date of the '443 patent.  For example, numerous references cited herein

22   disclose either expressly or inherently the use and benefits of capacitive touch-sensitive screens.

23   (*See, e.g.*, Plaisant System (included a MicroTouch touchscreen, a capacitive touch-sensitive

24   screen); Hsu '860 at 2:66-3:25 (describing the benefits of capacitive touch-sensitive screens

25   over, *e.g.*, resistive touch-sensitive screens); Plaisant June 1990 at 19 (noting that capacitive

26   touch-sensitive screens are "better for tasks that involve dragging objects on the screen").)  A

27   person of ordinary skill in the art would have understood that the benefits of capacitive touch-

28   sensitive screens would have improved on the user interface taught by Apple Newton.  For

1  example, a person of ordinary skill in the art would have appreciated that the touchscreen

2  interface disclosed in Apple Newton would have been improved if the user could interact with

3  the touch-sensitive screen by sliding his finger without having to exert pressure on the screen.  A

4  person of skill in the art would have understood that such combination would improve the

5  usability of the invention taught by Apple Newton because it would allow the user to more easily

6  perform the user interface operations taught by Apple Newton.

7        A person of ordinary skill in the art would further have understood that implementing the

8  touch screen user interface taught by Apple Newton using the capacitive proximity sensing

9  system and touch screen taught by Hsu '860, the capacitive touch-sensitive screen taught by

10  Schrock '908, or the capacitive touch-sensitive screen used in the Plaisant System would have

11  been straightforward and predictable.  Hsu '860, Schrock '908, the Plaisant System, and Apple

12  Newton all disclose user interfaces implemented on a touch-sensitive screen that respond to

13  finger movement. (*See, e.g.*, Hsu '860 at 2:57-60, 4:4-23, 5:22-53, 6:14-37, Figs.1-4; Schrock

14  '908 at 3:14-23, 3:46-49; Plaisant System; Newton MessagePad Handbook at 13-19, 44-45, 57-

15  69.)  In addition, Hsu '860 specifically teaches applying a capacitive touch-sensitive screen to

16  "hand held devices" such as "personal digital assistants" and hand held computers.  (Hsu '860 at

17  2:57-60.)  Therefore, a person of ordinary skill would be able to modify the user interface of

18  Apple Newton such that it implemented the capacitive touch-sensitive screens taught or used by

19  these other prior art references to detect being touched by a user's finger without requiring an

20  exertion of pressure on the screen.

21        Exhibit A-13 further identifies how the Apple Newton, alone or in combination with

22  other references, renders obvious claim 19.

23        **Pisutha-Arnond '116** also anticipates and/or renders obvious claim 19.  Pisutha-Arnond

24  '116 was not disclosed to, or considered by, the USPTO during the prosecution of the '443

25  patent.  While the USPTO considered Pisutha-Arnond '116 during prosecution of the parent

26  application that issued as the '691 patent, the Examiner did not consider the aspects of Pisutha-

27  Arnond '116 discussed below relating to selection and activation using its graphical user

28  interface.  Pisutha-Arnond '116 issued on April 28, 1998, and thus qualifies as prior art against

1    the Asserted Claims of the '443 patent at least under pre-AIA §§ 102(a), (b), and (e).  Pisutha-

2    Arnond '116 discloses a gesture-based user interface for interacting with a touch-sensitive screen

3    on a mobile phone.  (*See, e.g.*, Pisutha-Arnond '116 at 2:62-67, 3:23-40, 4:11-39, 5:14-30, 5:48-

4    55, Figs. 1, 5-8.)  Pisutha-Arnond '116 teaches a user interface capable of detecting movement of

5    a pointer device, such as a user's finger, to select an operation, *e.g.* replying to an email.

6    Pisutha-Arnond '116 also discloses deactivating a selected operation while the user's finger is

7    touching the screen, *e.g.*, by using gestures to bypass the display of certain user interface option.

8    (*See, e.g.*, Pisutha-Arnond '116 at 3:23-40, 4:11-39, 4:56-5:13, Figs. 1, 5-8.)

9            To the extent Pisutha-Arnond '116 does not expressly disclose the use of a touch-

10   sensitive screen that is capable of detecting movement of a finger without requiring exertion of

11   pressure, such screens, *e.g.*, capacitive touch-sensitive screens, were known in the art long before

12   the purported effective filing date of the '443 patent.  For example, numerous references cited

13   herein disclose either expressly or inherently the use and benefits of capacitive touch-sensitive

14   screens.  (*See, e.g.*, Plaisant System (included a MicroTouch touchscreen, a capacitive touch-

15   sensitive screen); Hsu '860 at 2:66-3:25 (describing the benefits of capacitive touch-sensitive

16   screens over, *e.g.*, resistive touch-sensitive screens); Plaisant June 1990 at 19 (noting that

17   capacitive touch-sensitive screens are "better for tasks that involve dragging objects on the

18   screen"); Schrock '908.)  A person of ordinary skill in the art would have understood that the

19   benefits of capacitive touch-sensitive screens would have improved on the user interface taught

20   by Pisutha-Arnond '116.  For example, a person of ordinary skill in the art would have

21   appreciated that the touchscreen interface disclosed in Pisutha-Arnond '116 would have been

22   improved if the user could interact with the mobile phone screen by sliding his finger without

23   having to exert pressure on the screen.  A person of skill in the art would have understood that

24   such combination would improve the usability of the invention taught by Pisutha-Arnond '116

25   because it would allow the user to more easily perform the user interface operations taught by

26   Pisutha-Arnond '116.

27           A person of ordinary skill in the art would further have understood that implementing the

28   touch screen user interface taught by Pisutha-Arnond '116 using the capacitive proximity sensing

system and touch screen taught by Hsu '860, the capacitive touch-sensitive screen taught by Schrock '908, or the capacitive touch-sensitive screen used in the Plaisant System would have been straightforward and predictable.  Hsu '860, Schrock '908, the Plaisant System, and Pisutha-Arnond '116 all disclose user interfaces implemented on a touch-sensitive screen that respond to finger movement. (*See, e.g.*, Hsu '860 at 2:57-60, 4:4-23, 5:22-53, 6:14-37, Figs.1-4; Schrock '908 at 3:14-23, 3:46-49; Plaisant System; Pisutha-Arnond '116 at 2:62-67, 3:23-40, 4:11-39, 5:14-30, 5:48-55, Figs. 5-8.)  In addition, Hsu '860 specifically teaches applying a capacitive touch-sensitive screen to a cell phone.  (Hsu '860 at 2:57-60.)  Therefore, a person of ordinary skill would be able to modify the user interface of Pisutha-Arnond '116 such that it implemented the capacitive touch-sensitive screens, which detect being touched by a user's finger without requiring an exertion of pressure on the screen, taught or used by these other prior art references.

Exhibit A-14 further identifies how Pisutha-Arnond '116, alone or in combination with other references, renders obvious claim 19.

### C.      Invalidity of the '691 Patent Based on 35 U.S.C. §§ 102 and 103

The Asserted Claims of the '691 patent are invalid as anticipated under 35 U.S.C. § 102(a), (b), (e), and/or (g), and/or render obvious under 35 U.S.C. § 103 by the following prior art references as set forth below.  The combinations that render each claim obvious are identified in the individual charts.

| Chart No. | Primary Reference | Claims Anticipated | Claims Rendered Obvious |
|---|---|---|---|
| B-1 | U.S. Patent No. 5,745,719 ("Falcon '719") | 2-6, 12-16, 24, 26, 28, 42, 44, 45, 47, 49; 52-56, 62-66, 74, 76, 78, 92, 94, 95, 98, 100 | All asserted claims |

| Chart No. | Primary Reference | Claims Anticipated | Claims Rendered Obvious |
|-----------|-------------------|--------------------|--------------------------|
| B-2 | U.S. Patent No. 6,859,909 ("Lerner '909") | 2-6, 12-16, 24, 26, 28, 29-31, 35, 36, 42, 44, 45, 47, 49, 52-56, 62-66, 74, 76, 78, 79, 81, 85, 86, 92, 94, 95, 98, 100 | All asserted claims |
| B-3 | The Design and Evaluation of Marking Menus ("Kurtenbach") | 2-6, 12-16, 24, 26, 28, 29-31, 35, 36, 42, 44, 45, 47, 49, 52-56, 62-66, 74, 76, 78, 79, 81, 85, 86, 92, 94, 95, 98, 100 | All asserted claims |
| B-4 | U.S. Patent No. 6,073,036 ("Heikkinen '036") | All asserted claims | All asserted claims |
| B-5 | U.S. Patent 6,211,856 ("Choi '856") | 2-6, 12-16, 24, 26, 28, 29-31, 35, 36, 42, 44, 45, 47, 49, 52-56, 62-66, 74, 76, 78, 79, 81, 85, 86, 92, 94, 95, 98, 100 | All asserted claims |
| B-6 | Apple Newton MessagePad ("Apple Newton") | 2-6, 12-16, 24, 26, 28-31, 35, 36, 42, 44, 45, 47, 49; 52-56, 62-66, 74, 76, 78, 79, 81, 85, 86, 92, 94, 95, 98, 100 | All asserted claims |
| B-7 | IBM Simon | All asserted claims | All asserted claims |
| B-8 | Ericsson R380 | All asserted claims | All asserted claims |
| B-9 | U.S. Patent No. 5,745,116 ("Pisutha-Arnond '116") | All asserted claims | All asserted claims |

| Chart No. | Primary Reference | Claims Anticipated | Claims Rendered Obvious |
|---|---|---|---|
| B-10 | Plaisant Touch Screen System ("the Plaisant System") | 2-6, 12-16, 24, 26, 28-31, 35, 36, 42, 44, 45, 47, 52-56, 62-66, 74, 76, 78, 79, 81, 85, 86, 92, 94, 95, 98 | All asserted claims |
| B-11 | U.S. Patent No. 5,347,295 ("Agulnick '295") | 2-6, 12-16, 24, 26, 28-30, 36, 42, 44, 45, 47, 49; 52-56, 62-66, 74, 76, 78, 79, 86, 92, 94, 95, 98, 100 | All asserted claims |
| B-12 | U.S. Patent No. 5,721,853 ("Smith '853") | 2-6, 12-16, 24, 26, 28, 42, 44-45, 47, 52-56, 62-66, 74, 76, 78, 92, 94-95, and 98 | All asserted claims |
| B-13 | U.S. Patent No. 5,923,908 ("Schrock '908") | 2-6, 12-16, 24, 26, 28-30, 36, 42, 44, 45, 47, 49; 52-56, 62-66, 74, 76, 78, 79, 86, 92, 94, 95, 98, 100 | All asserted claims |
| B-14 | U.S. Patent No. 6,466,197 ("Kim '197") | 2-6, 12-16, 24, 26, 28, 29-30, 35, 36, 42, 44, 45, 47, 52-56, 62-66, 74, 76, 78, 79, 85, 86, 92, 94, 95, 98 | All asserted claims |
| B-15 | Star7 Prototype Touch Screen System ("the Star7 System") | 2-6, 12-16, 24, 26, 28, 29-31, 35, 36, 42, 44, 45, 47, 49, 52-56, 62-66, 74, 76, 78, 79, 81, 85, 86, 92, 94, 95, 98, 100 | All asserted claims |

| Chart No. | Primary Reference | Claims Anticipated | Claims Rendered Obvious |
|---|---|---|---|
| B-16 | U.S. Patent No. 5,570,113 ("Zetts '113") | 2-6, 12-16, 24, 26, 28-31, 35, 36, 42, 44, 45, 47, 52-56, 62-66, 74, 76, 78, 79, 81, 85, 86, 92, 94, 95, 98 | All asserted claims |
| B-17 | U.S. Patent No. 5,463,725 ("Henckel '725") | 2-6, 12-16, 24, 26, 28-31, 35, 36, 42, 44, 45, 47, 49; 52-56, 62-66, 74, 76, 78, 79, 81, 85, 86, 92, 94, 95, 98, 100 | All asserted claims |
| B-18 | EO Personal Communicator with PenPoint OS | All asserted claims | All asserted claims |

1.      **Anticipation**

a.      **Claim 2**

Claim 2 recites:

A graphical user interface (GUI), which may comprise an update of an existing program, that may fully operate a GUI by a two step method of movement of a pointer (0) to operate one or more functions within the GUI,

wherein, said existing program is any existing program that can operate the movement of the pointer (0) over a screen (300) and has one or more functions operated by one or more other methods apart from said two step method,

and/or one or more functions operated by said one or more other methods in said existing program can be updated to operate by said two step method,

wherein said GUI executes one or more functions within the GUI by the completion of the following said two step method:

first said pointer (0) is immediately adjacent or passes within a control area (1), which is an area of the screen (300) that may be any size including from a pixel on the screen (300) to occupying the whole screen (300),

and second by the completion of a subsequent movement of said pointer (0) according to a specified movement generates a 'click' event, thereby triggering one or more functions within the GUI.

Claim 52 is a method claim that recites the same steps recited in claim 2.

Claims 2 and 52 are anticipated at least by the following prior art references: Pisutha-Arnond '116, Plaisant System, Schrock '908, Kim '197, Star7 System, and Henckel '725. A more detailed disclosure of how these prior art references anticipate claims 2 and 52 of the '691 patent is provided in Exhibits B-9, B-10, B-13, B-14, B-15, and B-17. These are merely exemplary anticipatory references. The complete set of references that anticipate the Asserted Claims of the '691 patent is identified in the table above.

**Pisutha-Arnond '116** anticipates claims 2 and 52. Pisutha-Arnond '116 issued on April 28, 1998, and thus qualifies as prior art against the Asserted Claims of the '691 patent at least under pre-AIA §§ 102(a), (b), and (e). It was applied by the Examiner during the prosecution of the '691 patent, but merely for its disclosure that "another pointing device, such as a mouse, joystick, touch-pad, or even a human finger, could be substituted for a pen or stylus (column 2, lines 63-67)." (Office Action dated Nov. 18, 2009 at 17-19.) This citation represents the Examiner's only consideration of Pisutha-Arnond '116 in the prosecution history of the '893 application. The Examiner did not rely on (or acknowledge) any of the features relating to the GUI taught by Pisutha-Arnond '116, which anticipates claim 2. For example, Pisutha-Arnond '116 discloses a touch-sensitive device (touch-sensitive screen 150 on device 100) using a GUI for detecting and interpreting gesture-based commands made by a human finger. (*See, e.g.*, Pisutha-Arnond '116 at 2:62-67, FIGs. 3, 5-8.) Pisutha-Arnond '116 discloses that a completion of a movement of said pointer (pointing device 190 and detected touch on screen, *see* FIGs. 5 and 6) according to a specified movement (*e.g.*, line 620 shown in FIGs. 6 and 8) generates a "click" event, thereby triggering one or more functions within the GUI (*e.g.*, the "Reply" function, as shown in FIG. 8). (*See, e.g.*, Pisutha-Arnond '116 at 4:23-37, 5:1-13; FIGs. 6 and 8.) For example, the completion of this movement from right to left generates a click event that

triggers a function that displays the palette button 454, which prompts the user to reply to the email. (*Id.*) To the extent that claim element pointer (0) is "a visible bitmap representing a button or slider," as Zeroclick asserts in its Amended Exhibits B1–B3 to its Amended Infringement Contentions, the Pisutha-Arnond '116 discloses a visible bitmap representing a button.



Exhibit B-9 further identifies where specifically in Pisutha-Arnond '116 each element of each Asserted Claim is found.

**Plaisant System** also anticipates claims 2 and 52. The Plaisant System was not disclosed to, or considered by, the USPTO during the prosecution of the '691 patent. It was developed in 1990-1992 by researchers at the University of Maryland to conduct one or more usability studies of six different touchscreen toggle designs around 1990-92, and thus qualifies as prior art against the Asserted Claims of the '691 patent at least under pre-AIA §§ 102(a) and (b). The Plaisant System discloses a GUI that executes one or more functions. (*See, e.g.*, Plaisant November 1990 at 4, 5 ("When users touch the button the background color darkens and the state changes to OFF when the finger is released . . ."); *see also* Plaisant November 1990 at 6.) The Plaisant System discloses that the GUI operates via a two step method (*e.g.*, select and slide of various "toggle[s]" described in Plaisant November 1990 at 4-6) to operate one or more functions (*e.g.*,

Plaisant November 1990 at 1).  The Plaisant System discloses a completion of a subsequent

movement (*e.g.*, the slide movement of the select and slide two-step movements) of a pointer

(*e.g.*, contacted area of screen in Plaisant Video under finger at 3:07-3:15, 3:16-3:21, and 3:23-

3:35) according to a specified movement (*e.g.*, sliding finger along Rocker, Slider, and Lever

toggles shown in Plaisant November 1990 at 5-6) generates a "click" event (toggles Rocker,

Slider, and Lever toggle on or off), thereby triggering one or more functions within the GUI

(Plaisant November 1990 at 1, 9). To the extent that claim element pointer (0) is "a visible

bitmap representing a button or slider," as Zeroclick asserts in its Amended Exhibits B1–B3 to

its Amended Infringement Contentions, the Plaisant System discloses a visible bitmap

representing a slider.



(*See, e.g.,* Plaisant Video at 3:18.)



(See, e.g., Plaisant Video at 3:19 ("click" event).)

Exhibits B-10 further identifies how specifically the Plaisant System teaches each

element of each asserted claim.

**Schrock '908** also anticipates claims 2 and 52.  Schrock '908 was not disclosed to, or

considered by, the USPTO during the prosecution of the '691 patent.  Schrock '908 issued on

July 13, 1999, and thus qualifies as prior art against the Asserted Claims of the '691 patent at

least under pre-AIA §§ 102(a), (b), and (e).  Schrock '908 teaches a camera having a touch-

sensitive screen and a GUI that executes one or more functions by the completion of a two step

method.  (*See, e.g.*, Schrock '908 at 3:26-40, 46-49.)  For example, Schrock '908 teaches that the

shutter of the camera may be triggered using a two-step function that involves moving a shutter icon on the touch-sensitive screen with a finger from a location A to a location B. (*See, e.g.*, Schrock '908 at 3:33-36.) As taught in Schrock '908, the shutter icon corresponds to pointer (0) under Zeroclick's apparent read of claim 2, and the movement of the shutter icon 28 from location 28a to location 28b, as shown in Figure 2 below, corresponds to the required completion of a subsequent movement that generates a click event under Zeroclick's apparent read of claim 2, thereby triggering the shutter function within the GUI. (*See, e.g.*, Schrock '908 at 4:26-40, 4:49-63, Figs. 2 and 4.) To the extent that claim element pointer (0) is "a visible bitmap representing a button or slider," as Zeroclick asserts in its Amended Exhibits B1–B3 to its Amended Infringement Contentions, Schrock '908 discloses a visible bitmap representing a slider.



*Fig. 2*

Exhibit B-13 further identifies where specifically in Schrock '908 each element of each Asserted Claim is found.

**Kim '197** also anticipates claims 2 and 52. Kim '197 was not disclosed to, or considered by, the USPTO during the prosecution of the '691 patent. Kim '197 was filed on June 28, 1999, and thus qualifies as prior art against the Asserted Claims of the '691 patent at least under pre-AIA § 102(e). Kim '197 teaches "a method for driving a pointing device of a computer system capable of performing the same function as a button click by moving a pointer to a specific direction without clicking a button of the pointing device." (Kim '197 at 3:25-29.) For example, Kim '197 teaches a GUI that makes it "possible to perform the same corresponding button click

1    functions by moving a pointer a specific direction over a predetermined distance without using a

2    button of a pointing device."  As shown in Figure 3A below, Kim '197 teaches that the GUI

3    executes a function by the completion of a movement of a pointer according to a two-step

4    method.  (Kim '197 at 4:45-48.)  For example, Kim '197 teaches that moving the pointer 320a

5    from user interface area 305 (i.e., the claimed control area (1)) along a predetermined path to the

6    left 320b and down 320c, generates a control signal (i.e., 'click' event) that performs the same

7    function as a button click.  (*See, e.g.¸* Kim '197 at 6:22-34, 8:7-17.)



Fig.  3A

18       Exhibit B-14 further identifies where specifically in Kim '197 each element of each

19   Asserted Claim is found.

20       **Star7 System** also anticipates claims 2 and 52.  Certain features of the Star7 were

21   patented as U.S. Patent No. 6,160,551 ("Naughton '551").  The Star7 System, Star7 Video, and

22   Naughton '551 were not disclosed to, or considered by, the USPTO during the prosecution of the

23   '691 patent.  The Star7 System was developed by Sun Microsystems, Inc. in 1991-92, and thus

24   qualifies as prior art against the Asserted Claims of the '691 patent at least under pre-AIA §§

25   102(a) and (b).  The Star7 System was a PDA prototype with a touch-sensitive screen.  (Star7

26   Video at 0:05-19.)

27

28

As discussed above, the Star7 System includes a drag and transfer that allows a user to move a virtual object on the touch-sensitive screen from one virtual location to another via a virtual portal.  (Star7 Video at 7:41-7:51.) This exemplary two-step method of pointer movement to operate the GUI transfer function proceeds as follows.  In the first step, the user places his finger in a control area (*e.g.*, the virtual console) to select an object representing a virtual TV programming guide (*id*. at 7:43).  Then, in a second step, the user moves his finger out of the control area, dragging the object to a "portal" in order to change the object's virtual location within the GUI.  (*Id*. at 7:45.)  Completion of the second movement of the user's finger (and dragged object) generates a "click" event, thereby triggering the transfer of the object's location to a different virtual room within the GUI.  (*Id*. at 7:50.)



(Star7 Video at 7:43 (annotated), first step of selecting TV guide "Space Shuttle.")

1

2

3

4

5

6

7

8

9



10          (Star7 Video at 7:45, second step of moving TV guide "Space Shuttle" object to portal.)

11

12

13

14

15

16

17

18

19



20

21          (Star7 Video at 7:47, "click" event initiates, as visually indicated by expansion of portal.)

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9



10          (Star7 Video at 7:50, "click" event executes bringing object to a new room.)

11

12          Exhibit B-15 further identifies how specifically the Star7 System teaches each element of

13     each asserted claim.

14          **Henckel '725** also anticipates claims 2 and 52.  Henckel '725 was not disclosed to, or

15     considered by, the USPTO during the prosecution of the '691 patent.  Henckel '725 issued on

16     October 31, 1995, and thus qualifies as prior art against the Asserted Claims of the '691 patent at

17     least under pre-AIA §§ 102(a), (b), (e), and (g).  Henckel '725 discloses an e-book reader device

18     with a GUI and a touch-sensitive screen for displaying a book or magazine.  Using his finger, the

19     user can manipulate the pages shown on the GUI.  For example, the user may cause the device to

20     perform functions by sliding his finger on the screen from one location to another, such as

21     turning a single page of a book or activating a quick page turning feature.  (*See, e.g.*, Henckel

22     '725 at Abstract, 1:49-57, 2:16-18, 2:51-3:28, 4:25-52, Figs. 1-4.)  As one example, Henckel

23

24

25

26

27

28

'725 teaches that the user may slide his finger from location 36 to location 38 in Figure 4 to activate the quick page turning feature.  (*See, e.g.*, Henckel '725 at 4:25-52, Fig. 4.) (Henckel '725 at Fig. 4.)

Exhibit B-17 further identifies how specifically Henckel '725 teaches each element of



*Fig. 4*

each asserted claim. (*See, e.g.*, Henckel '725 at 4:25-52, Fig. 4.)

### b.    Claim 3

Claim 3 recites:

A GUI according to claim 2 wherein, the second step of said two step method is:

second by the completion of said subsequent movement of said pointer (0) within a predetermined path area (3) according to a specified movement generates said 'click' event, which simulates the direct clicking of a control, thereby triggering a function related with said control area (1),

and/or said subsequent movement and/or said predetermined path area (3) of said pointer (0) is adjustable for the purpose of error prevention, so that said one or more functions accessible within the GUI generated by said 'click' event is less likely to be accidentally triggered than if said one or more functions accessible within the GUI was triggered by said pointer (0) being immediately adjacent or moving over said control area (1).

Claim 3 is anticipated by at least Pisutha-Arnond '116, Plaisant System, Schrock '908, Kim '197, Star7 System, and Henckel '725.  These references teach the two-step method recited in claim 2 and disclose that the subsequent movement of said pointer (0) within a predetermined path area according to a specified movement generates a 'click' event.  For example, Pisutha-Arnond '116 teaches that subsequent movement within the predetermined path defined by the line 620 as shown in Figure 6 triggers the 'click' event.  (Pisutha-Arnond '116 at 4:23-37, FIG. 6.)  Moreover, the Plaisant System teaches that the movement of the toggle must be from one side to the other (*i.e.*, within a predetermined path).  (*See, e.g.*, Plaisant November 1990 at 4-6.)  Furthermore, Schrock '908 teaches that the subsequent movement of the shutter icon 28 within the predetermined path are from 28a to 28b triggers the 'click' event.  (Schrock '908 at 4:26-45)  Kim '197 teaches, for example, that the subsequent movement of pointer 320a within the predetermined path are defined by the left-down movement (*i.e.*, along arrowed path B) shown in Figure 3A triggers the 'click' event.  (Kim '197 at 6:22-44.)  Moreover, the Star 7 System discloses that the subsequent movement according to a predetermined path from the original location of the icon that is to be moved to the portal through which the icon is moved triggers the 'click' event.  (*See, e.g.*, Star7 Video at 7:41-7:51.)  Finally, Henckel '725 teaches, *e.g.*, that the subsequent movement within a predetermined path between points 38 and 36 in Figure 4 causes the pages of the book to flip rapidly in increasing or decreasing order, respectively.

Claim 53 is a method claim that recites the same steps recited in claim 3 and is therefore anticipated for the same reasons as described below with respect to claim 3.  A more detailed disclosure of how these prior art references anticipate claims 3 and 53 of the '691 patent is provided in Exhibits B-9, B-10, B-13, B-14, B-15, and B-17.

### c.   Additional Asserted Dependent Claims of the '691 Patent

All of the remaining Asserted Claims of the '691 patent depend from claims 3 or 53. These dependent claims add non-novel limitations relating to the size and nature of the control area (claims 4, 6, 12-14, 54, 56, and 62-64); resetting of the control area (claims 42 and 92); the size and nature of a "predetermined path area" (claims 3, 5, 15-16, 53, 55, and 65-66); the

direction of pointer movement (claims 26, 28, 76, and 78); the nature of the pointer (claims 44-45 and 94-95); the use of a touch screen, mobile phone, or "pocket-sized personal computer" (claims 29-36, 47-49, 79-86, and 98-100); or use in conjunction with "other methods to generate said one or more functions within the GUI" (claims 24 and 74).

All of the additional limitations of the dependent claims were known in the art well before the effective filing date of the '691 patent.  As a result, each of these Asserted Claims of the '691 patent is anticipated by at least by the references identified in the chart above.  A detailed disclosure of how these claims are invalid in view of the cited prior art references is provided in Exhibits B-1 through B-18.

### 2. Obviousness

As set forth below and in the Invalidity Charts attached as Exhibits B-1 to B-18, to the extent the foregoing references are found not to anticipate the Asserted Claims of the '691 patent, the foregoing references render the asserted claims obvious under 35 U.S.C. § 103 either alone or in combination with each other or one or more of the other references identified above.  The inclusion of certain exemplary combinations in these Invalidity Charts does not exclude other combinations.  The combinations are not meant to be exhaustive.  Apple contends that it would have been obvious to a person of ordinary skill in the art to combine any of the various references cited herein so as to practice the Asserted Claims of the '691 patent.  Apple reserves its rights to identify additional specific combinations as well as to detail and explain such combinations.

The Asserted Claims of the '691 patent, under Zeroclick's apparent read in its Infringement Contentions, as best understood by Apple, disclose in essence the following features:  a GUI, a pointer, a control area, movement within a predetermined path, and a click event.  As discussed above, certain dependent claims further recite the use of a touch screen, mobile phone, or "pocket-sized personal computer."  As with the '443 patent, Zeroclick did not "invent" any of these features.  Rather, as discussed below and more fully in the attached Exhibits B-1 to B-18, each element of the Asserted Claims of the '691 patent is fully disclosed in the prior art.

1    At the time of the purported effective filing and/or alleged invention dates of the '691

2    graphical user interfaces and pointer devices (*e.g.*, mice) were conventional computer

3    components.  The use of control areas, the movement of pointers within predetermined paths,

4    and clicking are inherent in the use of pointer devices.  Moreover, such features were disclosed

5    in various prior art references cited herein.  (*See, e.g.*, Schrock '908 at 4:33-67; Henckel '725 at

6    4:25-52; Kim '197 at 6:10-39; the Plaisant System; the Star7 System, the Apple Newton; the

7    Ericsson R380; the EO Personal Communicator.)

8    Furthermore, touch-sensitive screens were developed decades before the purported

9    effective filing date of the '691 patent.  (*See, e.g.*, Pisutha-Arnond '116 at 2:62-67, FIGs. 3, 5-8;

10   IBM Simon User Manual at 4, 9-11, 23, 45-47, 60-63; Ericsson R380 User's Manual at 10, 23-

11   25, 68-73, 94-103; Hayhurst '859 at Figs. 1 and 2, 2:17-25, 6:16-24, 10:6-12, 10:20-24; Mead

12   '204 at Abstract, FIG. 1-4, 1:46-2:27, 4:26-5:5; 5:31-54, 8:23-11:35; Schrock '908 at Abstract,

13   FIG. 1, 2, 4, 5-7, 3:24-64, 4:20-67.)  Zeroclick therefore did not invent the touch screen recited in

14   claims 29-31, 35-36, and 48-49.

15   Finally, mobile phones with touch-sensitive screens (as recited in claim 48) and pocket

16   sized personal computers with touch-sensitive screens (as recited in claim 49) were known many

17   years before the purported effective filing date of the '691 patent.  (*See, e.g.*, Pisutha-Arnond

18   '116 at 2:51-67, Figs. 1, 3, 5-8; Hsu '860 at 2:57-60; IBM Simon User Manual at 9-11, 45-47;

19   Ericsson R380 User's Manual at 23-26, 68-73, 94-103.)

20   As explained herein and/or in the accompanying Invalidity Charts, in the event that any

21   of the Asserted Claims of the '691 patent is not found anticipated based on a determination that

22   some feature of the claim is not in an item of prior art, it would have been obvious to a person of

23   ordinary skill in the art as of the purported effective filing date of the '691 patent and/or the

24   alleged invention date of the Asserted Claims of the '691 patent to combine the various

25   references cited herein so as to practice the Asserted Claims of the '691 patent.  The prior-art

26   item renders the claim obvious because, as discussed above, the missing feature was known to

27   persons skilled in the art in the field at the time, could have been added by those persons to the

28   device or method disclosed by the prior art, and adding that known feature would yield

1    predictable results, so that the subject matter of the claim as a whole would have been obvious at

2    the time the invention was made to a person having ordinary skill in the art.  *See KSR Int'l Co. v.*

3    *Teleflex, Inc.*, 550 U.S. 398 (2007).

4           The motivation to combine comes from many sources, including the prior art (specific

5    and as a whole), common knowledge, common sense, predictability, expectations, industry

6    trends, design incentives or need, market demand or pressure, market forces, obviousness to try,

7    the nature of the problem faced, and/or knowledge possessed by a person of ordinary skill.

8    Apple reserves the right to rely on the knowledge of those skilled in the art, the testimony of

9    expert witnesses, and/or other prior art, to show that it would have been obvious to include the

10   allegedly missing limitation and to explain the motivation to combine the prior art elements.

11          For example, to the extent that any reference identified above does not disclose the use of

12   a touch-sensitive screen, it would have been obvious to a person of ordinary skill in the art at the

13   time of the invention of the '691 patent to implement the GUI disclosed in that reference on a

14   touchscreen.  The motivation to do so is particularly strong because GUIs on non-touch screens

15   sought to solve the same problem and come from the same field as GUIs on touchscreens:  both

16   are computer interfaces that respond to input from users.   It would have been obvious to try the

17   combination or modification in light of design incentives to:  allow users to "manually select a

18   screen object" by "intuitively tap[ing] or draw[ing] a point, on [the] screen object" (*see, e.g.*,

19   Pisutha-Arnond '116 at 3:28-31); allow "quick access to functions" through relatively "intuitive"

20   gestures, such as striking through text to delete (*id.* at 1:33-42); reduce the need for linear menus

21   and screen buttons which consume display space" (*id.* at 1:54-56); eliminate the need in other

22   capacitive systems for a stylus to provide input, frontal shielding, and a uniformly conductive

23   surface (Hsu '860 at 2:7-21); improve device durability (*id.* at 3:1-5, FIG. 1); improve

24   positioning accuracy and weather resistance without calibration (*id.* at 3:9-16); allow greater

25   transparency in the screen (*id.* at 3:16-18); and eliminate shape constraints imposed by the

26   requirement of a flexible substrate (*id.*at 3:20-25).  Moreover, the prior art teaches or suggests

27   making the combination or modification claimed in the patent.  The Examiner in prosecution of

28   the related '443 patent took Official Notice that it would have been obvious to implement a GUI

on a touch screen.  (Examiner's Official Notice, Final Rejection dated March 11, 2013 at 16.)
Therefore, a person of ordinary skill in the art would have been motivated to implement non-
touchscreen device GUIs on touchscreens.

As another example, to the extent that any reference identified above does not disclose
the use of a mobile phone or pocket sized personal computer, it would have been obvious to a
person of skill in the art as of the purported effective filing date of the '691 patent and/or the
alleged invention date of claims 48 and 49 of the '691 patent to implement the user interfaces
taught by Schrock '908, the Plaisant System, Henckel '725, the Star7 System, and other prior art
references cited herein, with references disclosing mobile phones and pocket-sized personal
computers, such as IBM Simon, Ericsson R380, Pisutha-Arnond '116, and Hsu '860.  The
motivation to do so is particularly strong because mobile phones and GUIs relate to the same
field of endeavor:  the field of human-interface design.  The idea of incorporating touch screens
into digital handheld devices (*e.g.*, mobile phones and pocket-sized personal computers)
preceded the purported effective filing date of the '691 patent by years.  (*See, e.g.*, Hsu '860 at
2:57-60, 2:66-3:25; 4:4-23, Fig. 1; Schrock '908 at 3:14-23, 3:46-49.)  In fact, the Examiner in
the prosecution of the related '443 patent took "Official Notice . . . that both the concept and the
advantages of using a mobile phone or specially utilizing a touch sensitive screen mobile phone
is notoriously well known and expected in the art." ('443 patent Examiner's Official Notice,
Final Rejection dated March 11, 2013 at 16.)  Moreover, the Examiner in the prosecution of the
'691 patent took "Official Notice . . . that both the concept and the advantages of working with a
different type and size of electronic computing device, such as small (portable) or big (desktop),
electrical switch type and computing device with panels is well known and expected in the art."
('691 patent Prosecution History, Final Rejection dated July 22, 2009 at 19.)  Therefore, a person
of ordinary skill in the art would have been motivated to combine the references disclosed above
with a mobile phone or a pocket-sized personal computer.

As another example, to the extent that any reference identified above does not disclose
pointer (0), it would have been obvious to a person of skill in the art as of the purported effective
filing date of the '691 patent and/or the alleged invention date of the Asserted Claims of the '691

1   patent to implement the GUIs taught by Pisutha-Arnond '116, Plaisant System, Schrock '908,

2   IBM Simon, Ericsson R380, and other prior art references cited herein, with Falcon '719, Smith

3   '853, or Kim '197, which disclose pointer (0) as an arrow, cursor or other bitmap indicating the

4   pointer on the computer screen representing the  location of the mouse position or pointer device

5   position in relation to the computer screen, (*see*, *e.g.*, Kim '197 at Fig. 3A, Fig. 3B, Fig. 3C, Fig.

6   5, 6:11–18, 6:22–44, 6:45–6:65, 6:66–7:25, 8:23–44).  The motivation to combine Kim '197

7   with the other references cited herein is strong because including pointer (0) could help the user

8   identify the location of the pointer and more easily and accurately move the pointer to execute

9   functions within the GUI.  Implementing pointer (0) would have been straightforward and

10  predictable.  The '691 patent discusses how it was known in the art that a "typical embodiment

11  of the conventional graphical user interface GUI" includes "a mouse input" that "moves a mouse

12  pointer across the computer display." ('691 patent at 1:36–55.)  Therefore, a person of ordinary

13  skill in the art would have been able to modify the GUIs of the references cited herein such that

14  they would implement the pointer (0) feature of Kim '197.

15      In light of the number of Asserted Claims of the '691 patent, Apple relies on the detailed

16  disclosure in Exhibits B-1 to B-18 of how the references identified in the table in Section II.C

17  above render obvious the Asserted Claims of the '691 patent and of the motivation to combine

18  any one of multiple prior art references cited herein.

19  **III.    INVALIDITY BASED ON 35 U.S.C. § 101**

20      The Asserted Claims are invalid under 35 U.S.C. § 101 as directed to patent-ineligible

21  subject matter.  The Supreme Court has long held that "'[l]aws of nature, natural phenomena,

22  and abstract ideas' are not patentable." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,

23  132 S. Ct. 1289, 1293 (2012) (citing *Diamond v. Diehr*, 450 U.S. 175, 185 (1981)).  In *Alice*

24  *Corp. Pty. Ltd. v. CLS Bank International*, the Supreme Court set forth a two-step framework for

25  determining eligibility of patent claims.  134 S. Ct. 2347, 2355 (2014).  First, one determines

26  whether the claims are directed to a patent-ineligible concept such as an abstract idea.  *Id.*

27  Second, if the claims are directed to patent-ineligible subject matter, one searches for an

28

1  "inventive concept," *i.e.,* determines whether anything else in the claims transforms them into

2  patentable subject matter.  *Id.*

3         Under the first step of *Alice*, an examination of the Asserted Claims—in light of

4  Zeroclick's Infringement Contentions—reveals that the Asserted Claims are directed to nothing

5  more than an abstract idea related to controlling devices.  For example, the patents state that the

6  purported invention allows "control of the computer" via "a series of pointer movements." ('443

7  patent at 3:29-30; '691 patent at 3:32-33.)  Furthermore, the claims are entirely devoid of any

8  inventive concept under the second step because nothing in the claims is new or novel, and

9  nothing provides a meaningful limitation over the abstract idea.  Thus, there is nothing in the

10  claims that transforms them into a patentable subject matter.  As discussed above with respect to

11  invalidity under 35 U.S.C. §§ 102 and 103, all elements of the Asserted Claims were well known

12  long before the purported effective filing date of the patents-in-suit.  For example, the

13  functionality of the recited user interface code was either inherent in all touch-sensitive devices

14  or explicitly disclosed in numerous prior art references before the effective filing date, as

15  identified above.  In addition, capacitive touchscreens, which detect movement of a finger on the

16  screen without requiring an exertion of pressure, were invented in the 1970s, and incorporated

17  into commercial touchscreen devices in the 1970s and 1980s.  (*See, e.g.*, A New Principle for an

18  X-Y Touch Screen (describing a new capacitive touch-sensitive screen); How CERN Broke the

19  Software Barrier at 791 (capacitive touch-sensitive screens developed by CERN commercially

20  available in 1977); The First Capacitative Touch Screens at CERN (same).)  And mobile phones

21  with touch-sensitive screens were available at least as early as 1994.  (*See, e.g.*, IBM Simon.)

22  Accordingly, the Asserted Claims of the patents-in-suit are invalid as directed to patent-ineligible

23  subject matter.

24  **IV.    INVALIDITY BASED ON 35 U.S.C. § 112**

25         Apple's invalidity contentions under 35 U.S.C. § 112 are set forth below.  Where a claim

26  is identified as failing to meet one or more requirements of § 112, it is to be understood that all

27  claims that depend from such a claim likewise are invalid pursuant to 35 U.S.C. § 112.  In

28  making these contentions, Apple is not necessarily proposing a specific level of ordinary skill in

the art, and these contentions are based at least in part on what Zeroclick may contend is the level of ordinary skill in the art.  Apple does not concede that Zeroclick's contentions as to the level of ordinary skill in the art are proper and may contest any such contentions.  Apple further reserves the right to modify and supplement, without prejudice, its Invalidity Contentions in light of positions taken by Zeroclick or its expert witness(es) concerning claim construction, infringement, equivalents and/or invalidity issues and/or claim construction positions adopted by the Court.

### A.    Invalidity of the '443 Patent Based on 35 U.S.C. § 112

#### 1.    The Asserted Claims of the '443 Patent Lack Enablement and/or Written Description Under 35 U.S.C. § 112, ¶ 1

As discussed above, the Asserted Claims of the '443 patent are invalid as anticipated and/or obvious in view of the prior art.  To the extent that Zeroclick contends that the limitations of the Asserted Claims are not found in the prior art, then they are also not adequately described or enabled by the patent specification as explained below.  The Asserted Claims of the '443 patent are not adequately described because the original specification as filed does not convey to those skilled in the art that, as of the relevant filing date, the named inventor was in possession of the full scope of the claimed invention.  In addition, these claims are not enabled such that one of ordinary skill in the art would understand how to practice the claimed invention without undue experimentation.  As such, the original specification as filed does not "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same."  35 U.S.C. § 112, ¶ 1.

For example, the Asserted Claims of the '443 patent recite a device comprising "a touch-sensitive screen configured to detect being touched by a user's finger without requiring an exertion of pressure on the screen."  As Zeroclick acknowledges in its Infringement Contentions, a capacitive touchscreen is one example of a touch-sensitive screen that can detect being touched by a finger without requiring an exertion of pressure.  As discussed above, however, capacitive touchscreens had been in the prior art for decades before the purported effective filing date of the

'443 patent. This limitation is thus not a novel aspect of the Asserted Claims of the '443 patent. To the extent that Zeroclick contends otherwise, the claims are invalid under 35 U.S.C. § 112, ¶ 1 because there is no evidence that demonstrates that the inventor was in possession of the invention at the time the application for the patent was filed. The specification of the '443 patent as originally filed fails to describe a device having a touch-sensitive screen that falls within the scope of the claims, and fails to provide any disclosure that would enable a person of ordinary skill in the art to make such a device.

Moreover, the Asserted Claims of the '443 patent recite user interface code configured to "detect one or more locations touched by a movement of the user's finger on the screen . . . and determine therefrom a selected operation" and "cause one or more selected operations . . . to deactivate while the user's finger is touching one or more locations on the screen." These limitations describe functionality inherently present in virtually all user interfaces running on a touch-sensitive screen. To the extent that Zeroclick contends otherwise, the claims are invalid under 35 U.S.C. § 112, ¶ 1 because there is no evidence that demonstrates that the inventor was in possession of the invention at the time the application for the patent was filed. The specification of the '443 patent as originally filed fails to describe or enable user interface code configured to detect finger location, select an operation, or deactivate an operation that falls within the scope of the claims. The specification fails to disclose an algorithm to perform these functions that is not coextensive with a microprocessor or general purpose computer. *See EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 623 (Fed. Cir. 2015); *see also Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364-65 (Fed. Cir. 2012) ("If special programming is required for a general-purpose computer to perform the corresponding claimed function, then the default rule requiring disclosure of an algorithm applies."). "A patentee cannot avoid providing specificity as to structure simply because someone of ordinary skill in the art would be able to devise a means to perform the claimed function." *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009). Moreover, there is "nothing in the specification to help cabin the scope of the functional language." *See ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 519 (Fed. Cir. 2012).

1

2

**2.      The Asserted Claims of the '443 Patent are Indefinite Under 35 U.S.C. § 112, ¶ 2**

3

4

5

6

7

The Asserted Claims of the '443 patent are invalid as indefinite because they do not "particularly point[] out and distinctly claim[] the subject matter." 35 U.S.C. § 112, ¶ 2. A patent is indefinite "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

8

9

As properly construed, the following limitations of claim 19 are found in the prior art, as described above:

10

11

- "user interface code being configured to detect one or more locations touched by a movement of the user's finger on the screen without requiring the exertion of pressure and determine therefrom a selected operation," and

12

13

- "the user interface code is further configured to cause one or more selected operations, which includes one or more functions available to the user interface code of the device, to deactivate  while the user's finger is touching one or more locations on the screen."

14

15

16

17

18

19

To the extent Zeroclick contends that these limitations are not found in the prior art, the Asserted Claims of the '443 patent are invalid under 35 U.S.C. § 112, ¶ 2, because the claims fail to particularly point out and distinctly claim the subject matter regarded as the alleged invention. For example, the following claim terms are not reasonably certain and are nowhere defined or explained with specificity in the patent or prosecution history:

20

- "detect,"

21

- "one or more locations touched by a movement of the user's finger,"

22

- "determine,"

23

- "selected operation,"

24

- "one or more functions available to the user interface code of the device,"

25

- "deactivate,"

26

- "without requiring the exertion of pressure," and

27

- "one or more locations on the screen."

28

1   As a result, the claims fail to reasonably apprise those skilled in the art as to their scope when

2   read in light of the specification, rendering the limits of the patent unknown.

3       **3.    The Asserted Claims of the '443 Patent Are Indefinite Under 35**
        **U.S.C. § 112, ¶ 6**

4

5       A claim can be a means-plus-function claim even if it does not use the word "means,"

6   where the claim fails to "recite sufficiently definite structure" or recites a "function without

7   reciting sufficient structure for performing that function."  *See Williamson v. Citrix Online, LLC*,

8   792 F.3d 1339, 1349 (Fed. Cir. 2015); *Media Rights Techs., Inc. v. Capital One Fin'l Corp.*, 800

9   F.3d 1366 (Fed. Cir. 2015) (means-plus-function limitations in method claims).

10      When a claim term is a computer-implemented means-plus-function limitation, the

11  Federal Circuit requires that "[a] patent must disclose, at least to the satisfaction of one of

12  ordinary skill in the art, enough of an algorithm to provide the necessary structure under § 112, ¶

13  6." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008).  In other words,

14  "a means-plus-function claim element for which the only disclosed structure is a general purpose

15  computer is invalid if the specification fails to disclose an algorithm for performing the claimed

16  function." *Net Moneyin, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008); *see also*

17  *Touchcom, Inc. v. Dresser, Inc.*, 427 F. Supp. 2d 730, 735 (E.D. Tex. 2005) (Ward, J.); *Gobeli*

18  *Research, Ltd. v. Apple Computer, Inc.*, 384 F. Supp. 2d 1016, 1022-23 (E.D. Tex. 2005) (failure

19  to provide algorithm for performing computer-implemented function is "fatal").

20      In *Harris*, the Federal Circuit made clear that the bright-line rule of *WMS Gaming* applies

21  to any "means-plus-function" element in which the function is implemented by a computer or

22  microprocessor.  *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005).  Simply

23  reciting, for example, "software" without further detail as to the disclosed structure is

24  insufficient.  *Id.*; s*ee also Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328,

25  1333 (Fed. Cir. 2008) (As "computers can be programmed to perform very different tasks in very

26  different ways, simply disclosing a computer as the structure . . . does not limit the scope of the

27  claim . . . as required by section 112 paragraph 6.").  Nor can a patentee rely on "a conclusory

28  assertion that one skilled in the art would understand the claimed means despite the failure to

disclose a structure." *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999); *see also Aristocrat*, 521 F.3d at 1331.

"In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999); *see also Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005) ("A computer implemented means-plus-function term is limited to the corresponding structure disclosed in the specification and equivalents thereof, and the corresponding structure is the algorithm.").

At least under Zeroclick's actual and/or apparent interpretation of the Asserted Claims of the '443 patent, the following limitations of claim 19 are indefinite means-plus-function limitations because (a) while they do not use the word "means," the claims fails to recite sufficiently definite structure and recites a function without reciting sufficient structure for performing that function and (b) the specification of the '443 patent fails to disclose an algorithm for implementing the function:

- "user interface code being configured to detect one or more locations touched by a movement of the user's finger on the screen without requiring the exertion of pressure,"
- "user interface code being configured to . . . determine therefrom a selected operation," and
- "user interface code is further configured to cause one or more selected operations . . . to deactivate while the user's finger is touching one or more locations on the screen."

To the extent that this limitation is not invalid under 35 U.S.C. § 112, ¶ 6, it is invalid under 35 U.S.C. §§ 102 and 103.  As discussed above, the references in Section I disclose touchscreens that do not require the exertion of pressure as well as user interface code configured to detect locations touched by a user's finger on the screen, determine a selected operation, and cause a selected operation to deactivate.

**B.**     **Invalidity of the '691 Patent Based on 35 U.S.C. § 112**

    **1.**     **The Asserted Claims of the '691 Patent Lack Enablement and/or Written Description Under 35 U.S.C. § 112, ¶ 1**

As discussed above, the Asserted Claims of the '691 patent are invalid as anticipated and/or obvious in view of the prior art.  To the extent that Zeroclick contends that the limitations of the Asserted Claims are not found in the prior art, then they are also not adequately described or enabled by the patent specification as explained below.  The Asserted Claims of the '691 patent are not adequately described because the original specification as filed does not convey to those skilled in the art that, as of the relevant filing date, the named inventor was in possession of the full scope of the claimed invention.  In addition, these claims are not enabled such that one of ordinary skill in the art would understand how to practice the claimed invention without undue experimentation.  As such, the original specification as filed does not "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112, ¶ 1.

For example, claims 2 and 52 recite "said existing program is any existing program that can operate the movement of the pointer (0) over a screen (300) and has one or more functions operated by one or more other methods apart from said two step method."  This limitation is not novel because various methods of operating a GUI were known in the prior art long before the effective filing date of the '691 patent.  To the extent that Zeroclick contends otherwise, the claims are invalid under 35 U.S.C. § 112, ¶ 1 because there is no evidence that demonstrates that the inventor was in possession of the invention at the time the application for the patent was filed.  The specification of the '691 patent fails to describe "other methods" that fall within the scope of the claims, and fails to provide any disclosure that would enable a person of ordinary skill in the art to create such other methods.

Furthermore, claims 2 and 52 recite an "update of an existing program, that may fully operate a GUI by a two step method."  This limitation is not novel because updates were known

in the prior art long before the effective filing date of the '691 patent.  To the extent that Zeroclick contends otherwise, the claims are invalid under 35 U.S.C. § 112, ¶ 1 because there is no evidence that demonstrates that the inventor was in possession of the invention at the time the application for the patent was filed.  The specification of the '691 patent fails to describe an "update" that falls within the scope of the claims, and fails to provide any disclosure that would enable a person of ordinary skill in the art to create such an update.  The specification fails to disclose an algorithm to perform these functions that is not coextensive with a microprocessor or general purpose computer.  *See EON Corp. IP Holdings LLC*, 785 F.3d at 623.  "A patentee cannot avoid providing specificity as to structure simply because someone of ordinary skill in the art would be able to devise a means to perform the claimed function." *Blackboard, Inc.*, 574 F.3d at 1385.  Moreover, there is "nothing in the specification to help cabin the scope of the functional language." *See ePlus, Inc.*, 700 F.3d at 519.

For example, claims 48 and 99 recite "the computer apparatus is a mobile phone with a touch screen" and claims 49 and 100 recite "the computer apparatus is a pocket-sized personal computer which has a touch screen."  These limitations are not novel because mobile phones with touchscreens and pocket-sized personal computers with touchscreens (*e.g.*, PDAs) were known in the prior art long before the effective filing date of the '691 patent.  To the extent that Zeroclick contends otherwise, the claims are invalid under 35 U.S.C. § 112, ¶ 1 because there is no evidence that demonstrates that the inventor was in possession of the invention at the time the application for the patent was filed.  The specification of the '691 patent as originally filed fails to describe a mobile phone with a touch screen or a pocket-sized personal computer with a touch screen that falls within the scope of the claims, and fails to provide any disclosure that would enable a person of ordinary skill in the art to make such devices.

Moreover, dependent claims 45 and 95 were added during prosecution and recite "wherein said pointer (0) is invisible."  The Claim Construction Order held that "Pointer (0)" must be visible, stating that, "Apple also argues persuasively that dependent claim 45 is invalid for lack of written description, given that the patent does not explain how an invisible pointer could 'indicate' its location 'on the screen' when the pointer would not be visible to the human

eye," (ECF No. 77 at 11), and "[t]he '691 patent fails to meet this requirement [of 35 U.S.C. § 112] as it pertains to an 'invisible' pointer because it does not explain how an invisible pointer can 'indicate' something," (*id*. at 11–12).

### 2. The Asserted Claims of the '691 Patent Are Indefinite Under 35 U.S.C. § 112, ¶ 2

The Asserted Claims of the '691 patent are invalid as indefinite because they do not "particularly point[] out and distinctly claim[] the subject matter." 35 U.S.C. § 112, ¶ 2. A patent is indefinite "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc*., 134 S. Ct. 2120, 2124 (2014).

At least claims 12, 13, 14 15, 35, 62, 63, 64, 65, and 85 are indefinite for lack of antecedent basis. In claims 12 and 62, the term "the appearance" lacks antecedent basis. In claim 13 and 63, the term "visual feedback" lacks antecedent basis. In claim 14 and 64, the term "the movement stages" lacks antecedent basis. In claim 15 and 65, the term "the original position" lacks antecedent basis. In claim 35 and 85, the term "the digit or pen" lacks antecedent basis.

For example, claims 2 and 52 recite "said existing program is any existing program that can operate the movement of the pointer (0) over a screen (300) and has one or more functions operated by one or more *other methods apart from* said two step method, and/or one or more functions operated by said one or more *other methods* in said existing program *can be updated* to operate by said two step method.." Meanwhile, claims 24 and 74 (which indirectly depend on claims 2 and 52, respectively) recite that the claimed "other methods" are used "*in conjunction* with one or more said *other methods* to generate said one or more functions within the GUI." These limitations are invalid under 35 U.S.C. § 112, ¶ 2 because they do not provide a reasonably clear and exclusive definition of the claimed "other methods" and because operating both "apart from" and "in conjunction with" an "other method" is not possible.

Moreover, claims 2 and 52 recite an "update of an existing program that may fully operate a GUI by a two step method" and "one or more functions within the GUI." These limitations are invalid under 35 U.S.C. § 112, ¶ 2 because the terms do not provide a reasonably clear and exclusive definition of the claimed update and functions respectively.

Furthermore, claims 24 and 74 are invalid because the use of the term "said one or more functions within the GUI" fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

Moreover, claims 16 and 66 are invalid because the term "adjustable to suit" is subjective claim language without any objective boundary. *See, Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1373 (Fed. Cir. 2014) (holding the claim phrase "unobtrusive manner" indefinite because the specification did not "provide a reasonably clear and exclusive definition, leaving the facially subjective claim language without an objective boundary").

### 3. The Asserted Claims of the '691 Patent Are Invalid Under 35 U.S.C. § 112, ¶ 4

Several of the dependent Asserted Claims of the '691 patent are invalid because they fail to "specify a further limitation of the subject matter claimed" in the claim from which they depend. 35 U.S.C. § 112, ¶ 4.

For example, claims 36 and 86 do not further limit claims 29 and 79, respectively, because they recite all possible touch screens that can display a GUI, which is already claimed implicitly in claim 29.

### 4. The Asserted Claims of the '691 Patent Are Indefinite Under 35 U.S.C. § 112, ¶ 6

As discussed above, a claim can be a means-plus-function claim even if it does not use the word "means," where the claim fails to "recite sufficiently definite structure" or recites a "function without reciting sufficient structure for performing that function." *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015); *Media Rights Techs., Inc. v. Capital One Fin'l Corp.*, 800 F.3d 1366 (Fed. Cir. 2015) (means-plus-function limitations in method claims). "[A] means-plus-function claim element for which the only disclosed structure is a

1  general purpose computer is invalid if the specification fails to disclose an algorithm for

2  performing the claimed function."  *Net Moneyin, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1367

3  (Fed. Cir. 2008).

4  At least under Zeroclick's actual and/or apparent interpretation of the Asserted Claims of

5  the '691 patent, the following limitation of claims 2 and 52 is an indefinite means-plus-function

6  limitation because (a) while it does not use the word "means," the claim fails to recite

7  sufficiently definite structure and recites a function without reciting sufficient structure for

8  performing that function and (b) the specification of the '691 patent fails to disclose an algorithm

9  for implementing the function:  "update of an existing program, that may fully operate a GUI by

10  a two step method."

11  **V.    DOCUMENT PRODUCTION**

12  In connection with its disclosure of these contentions, Apple also produces or makes

13  available for inspection and copying documents required by Patent L.R. 3-4(a) & (b) that are in

14  Apple's possession, custody or control.[6]

15  Because Zeroclick's Infringement Contentions do not suggest that detailed information

16  regarding the specifics of the implementation of the software underlying the accused

17  functionality is relevant to determining whether the accused products infringe, Apple has

18  produced or made available for inspection information corresponding to the level of detail

19  presented in Zeroclick's Infringement Contentions.  Apple will respond to any request by

20  Zeroclick for additional information regarding the implementation of the software underlying the

21  accused functionality at the appropriate time.

22

23

24

25

26

27  _____

      [6] Because the Court has not yet entered a protective order in this case, Apple produces
these documents pursuant to the Northern District of California's Patent Local Rule 2-2 Interim

28  Model Protective Order.

1

Dated:    September 24, 2019

SCOTT F. LLEWELLYN
NATHAN B. SABRI
CAMILA A. TAPERNOUX

2

3

MORRISON & FOERSTER LLP

4

5

By:   /s/ Scott F. Llewellyn
SCOTT F. LLEWELLYN

6

7

Attorneys for Defendant
APPLE INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28